**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL
A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| VIKING OFFSHORE (USA) INC. | § | Case No. 08-31219; |
| VIKING PRODUCER INC., | § | Case No. 08-31222; |
| VIKING PROSPECTOR INC., | § | Case No. 08-31224; |
| VIKING CENTURY INC. and | § | Case No. 08-31226; and |
| VIKING DRILLING ASA | § | Case No. 08-31228 |
| | § | |
| Debtors. | § | Jointly Administered under |
| | § | Case No. 08-31219 |
| | § | |
| | § | (Chapter 11) |

## DISCLOSURE STATEMENT FOR
## JOINT NON-CONSOLIDATING CHAPTER 11 PLAN OF LIQUIDATION

| | |
|---|---|
| John P. Melko  (TX 13919600)<br>Amy Catherine Dinn  (TX 24026801)<br>Robert S. Blanc  (TX 2444500)<br>Clinton Snow  (TX 24060629)<br>GARDERE WYNNE SEWELL LLP<br>1000 Louisiana, Suite 3400<br>Houston, TX  77002-5011<br>Telephone:  (713) 276-5500<br>Facsimile:  (713) 276-5555<br><br>Counsel for the Debtors and Debtors-in-Possession | Rhett G. Campbell  (TX 03714500)<br>Demetra L. Liggins  (TX 24026844)<br>Ira L. Herman  (TX 24063314)<br>THOMPSON & KNIGHT LLP<br>333 Clay Street, Suite 3300<br>Houston, TX  77002-4499<br>Telephone:  (713) 654-8111<br>Facsimile:  (713) 654-1871<br><br>Counsel for Norsk Tillitsmann ASA, Bond Trustee<br>under the First Lien Loan Agreement and Second Lien<br>Loan Agreement |

**DATED:**  October 2, 2009

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................3

II. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS........................3
   A.  General....................................................................................................3
   B.  Voting.....................................................................................................4
   C.  Voting Record Date ................................................................................4
   D.  Ballots.....................................................................................................5
   E.  Voting Deadline ......................................................................................5
   F.  Plan Acceptance .....................................................................................5
   G.  Invalid Votes..........................................................................................5
   H.  Confirmation Over Dissenting Class .......................................................5
   I.  Confirmation Hearing and Objection Deadline ........................................6

III. GENERAL INFORMATION ...............................................................................6
   A.  Brief History of the Debtors ....................................................................6
   B.  Organizational Structure of the Debtor Companies ..................................7
   C.  Historical Financial Information ..............................................................7

IV. THE DEBTORS' PRINCIPAL DEBT OBLIGATIONS...........................................8
   A.  First Lien Loan Agreement......................................................................8
   B.  Second Lien Loan Agreement ..................................................................8
   C.  Other Debt and Obligations-Maritime Liens ............................................9

V. EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11
CASE .....................................................................................................................9

VI. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ..........................11
   A.  Filing and First Day Pleadings ..............................................................11
   B.  Use of Cash...........................................................................................11
   C.  Retention of Debtors' Professionals ......................................................11
   D.  No Appointment of Creditors' Committee .............................................12
   E.  Real Property Leases ............................................................................12
   F.  Dennis Heagney Employment Incentives and Revised Agreement ..........12

VII. LITIGATION.................................................................................................13
   A.  The Bodewes Litigation.........................................................................13
   B.  The Odin Litigation ..............................................................................13
   C.  The Gulf Copper and Xtreme Industries Litigation.................................13
   D.  The New Gulf Copper Litigation...........................................................14
   E.  Claims Process and Bar Date.................................................................14
   F.  Investigation and Avoidance Actions .....................................................15

VIII. PROPOSED SALE OF THE VIKING ASSETS.................................................15
   A.  The Sale Procedures Motion and Order .................................................15
   B.  The Sale Negotiations ...........................................................................15
   C.  Post-Sales-Failure Discussions .............................................................16

**IX. THE PLAN**..................................................................................................................**16**
   A.   PREPARATION OF THE PLAN OF REORGANIZATION.............................................16
   B.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS
       UNDER THE PLAN ........................................................................................16
   C.   TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS ..........................................20
   D.   TREATMENT OF CLASSES .......................................................................................22
   E.   CLASSES 3B, 3C and 3D — Secured Claims of Maritime Lienholders.........................23
   F.   CLASSES 4.1A, 4.1B, 4.1C, 4.1D and 4.1E and CLASSES 4.2A, 4.2B, 4.2C,
       4.2D and 4.2E — Secured Claims of Bondholders. ..........................................................23
   G.   CLASSES 5A, 5B, 5C, 5D and 5E —General Unsecured Claims....................................24
   H.   CLASSES 6A, 6B, 6C, 6D and 6E —Intercompany Claims. ............................................24
   I.   CLASSES 7A, 7B, 7C, 7D and 7E — Holders of Equity Interests in the Debtors............25
   J.   CONDITIONS PRECEDENT TO OCCURRENCE OF THE EFFECTIVE DATE.........25
   K.   PLAN IMPLEMENTATION ......................................................................................26
   L.   THE LIQUIDATING TRUSTS AND THE LIQUIDATING TRUSTEES......................29
   M.  TRUST OVERSIGHT COMMITTEES ........................................................................32
   N.  DISPUTED CLAIMS, DISPUTED INTERESTS, AND MISCELLANEOUS
       DISTRIBUTION PROVISIONS.................................................................................33
   O.   EXECUTORY CONTRACTS AND LEASES ...............................................................36
   P.   RELEASES; INDEMNIFICATION; PLAN INJUNCTION ...........................................37
   Q.   CONFLICTS; JURISDICTION ...................................................................................39
   R.   CONDITIONS TO THE EFFECTIVENESS OF THE PLAN .........................................44
   S.   EFFECTS OF CONFIRMATION AND MISCELLANEOUS ........................................45
   T.   CERTAIN FACTORS TO BE CONSIDERED ............................................................46
   U.   CERTAIN BANKRUPTCY CONSIDERATIONS .......................................................46
   V.   RISKS RELATING TO PLAN ...................................................................................47

**X. CONFIRMATION OF THE PLAN** ........................................................................**47**
   A.   Classification ............................................................................................................47
   B.   Disclosure and Solicitation .........................................................................................47
   C.   Confirmation Hearing................................................................................................48
   D.   Requirements for Confirmation of the Plan ..................................................................48

**XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN OF REORGANIZATION** .................................................................................**51**
   A.   Liquidation Under Chapter 7 .....................................................................................51
   B.   Alternative Plan(s) of Reorganization ........................................................................51

**XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF PLAN OF
REORGANIZATION**..................................................................................................**52**
   A.   Introduction .............................................................................................................52
   B.   Consequences to Holders of Claims............................................................................52
   C.   Consequences of Discharge .......................................................................................55
   D.   Consequences To The Liquidating Trusts and Beneficiaries .........................................55

**XIII. CONCLUSION AND RECOMMENDATION**.....................................................**55**

## **EXHIBITS**

A.    Joint Non-Consolidating Plan of Liquidation

B.    Liquidation Analysis of the Debtors

C.    Claims and Causes of Action, including Chapter 5 Causes of Action

## INTRODUCTORY STATEMENT

THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE (THE "DISCLOSURE STATEMENT") WITH RESPECT TO THE JOINT NON-CONSOLIDATING PLAN OF LIQUIDATION (THE "PLAN") CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN.  WHILE THE DEBTORS BELIEVE THAT THESE SUMMARIES PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED.  SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS.  IF ANY INCONSISTENCIES EXIST BETWEEN THE TERMS AND PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS DESCRIBED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN AND SUCH OTHER DOCUMENTS SHALL CONTROL.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD REVIEW THE ENTIRE PLAN, ALL RELATED DOCUMENTS AND SEEK THE ADVICE OF ITS OWN COUNSEL BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY ENTITY OR ENTITY FOR ANY PURPOSE OTHER THAN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NOTHING CONTAINED HEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR SHALL BE ADMISSIBLE IN ANY PROCEEDING INVOLVING NT, THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

NO PARTY IS AUTHORIZED BY NT OR THE DEBTORS TO PROVIDE ANY INFORMATION WITH RESPECT TO THE DEBTORS, THE PLAN, THE DEBTORS' ANTICIPATED FINANCIAL POSITION, OR THE VALUE OF THE DEBTORS' BUSINESSES AND PROPERTIES OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

*THE DEBTORS HAVE PROVIDED THE INFORMATION IN THIS DISCLOSURE STATEMENT.* NT, ALTHOUGH A CO-PROPONENT OF THE PLAN, IS NOT RESPONSIBLE FOR AND SHALL HAVE NO LIABILITY AS TO THE ACCURACY OR ADEQUACY OF ANY OF THE INFORMATION CONTAINED HEREIN.

EXCEPT AS OTHERWISE NOTED HEREIN, THE INFORMATION CONTAINED HEREIN IS INTENDED TO DESCRIBE FACTS AND CIRCUMSTANCES ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION, UNDER ANY CIRCUMSTANCES, THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE OF

1

**THIS DISCLOSURE STATEMENT OR THAT NT OR THE DEBTORS WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION.**

HOUSTON 1049970v.8

## I.  INTRODUCTION

Viking Offshore (USA), Inc. ("Viking Offshore"), Viking Producer Inc. ("Viking Producer"), Viking Prospector Inc. ("Viking Prospector"), Viking Century Inc. ("Viking Century") and Viking Drilling ASA ("Viking Drilling", each a "Debtor" and collectively, the "Debtors" or "Viking") filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on February 29, 2008 (the "Petition Date").  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or committee of unsecured creditors has been appointed in this case.  Norsk Tillitsmann ASA ("NT" or the "Bond Trustee") is the Bond Trustee under the First Lien Loan Agreement and Second Lien Loan Agreement.  NT and the Debtors (the "Plan Proponents") are the proponents of the Plan.

On October 2, 2009, the Plan Proponents filed this Disclosure Statement with the Bankruptcy Court for approval in connection with the solicitation of acceptances and rejections of the Joint Non-Consolidating Chapter 11 Plan of Liquidation (the "Plan") dated September 29, 2009.  By order dated [_____], 2009, the Bankruptcy Court approved this Disclosure Statement as containing adequate information to provide holders of Claims against the Debtors, whose votes to either accept or reject the Plan are being solicited, to make an informed judgment whether to accept or reject the Plan.  All capitalized terms, not otherwise defined herein, shall have the meanings ascribed to such terms in the Plan.

## II.  NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

### A.      General

The purpose of this Disclosure Statement is to provide the holders of Claims against the Debtors entitled by the Bankruptcy Code to vote to accept or reject the Plan to make an informed decision.  All holders should read this Disclosure Statement in its entirety.  No solicitation of votes to accept or reject the Plan may be cast except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.  In considering how to vote, no holder should rely on any information relating to the Debtors and their assets other than the information contained in this Disclosure Statement.

All Entities receiving this Disclosure Statement are urged to study fully the provisions of the Plan and all other exhibits attached hereto.  This Disclosure Statement is not intended to replace careful analysis of the Plan.  Every effort has been made to explain fully the Plan as it affects holders of Claims and Interests.  However, to the extent any question arises, NT and the Debtors urge you to seek independent legal advice.

In reviewing the information contained in this Disclosure Statement, please keep in mind the following:

1.        Approval by the Bankruptcy Court of the Disclosure Statement does not constitute an endorsement by the Bankruptcy Court of the Plan or guarantee the accuracy and completeness of the information contained herein.

HOUSTON 1049970v.8

2.   There has been no independent audit of the financial information contained in this Disclosure Statement.  The financial information regarding the Debtors and their assets and liabilities has been derived from the Debtors' internal documents and available public records.  While every effort has been made by the Debtors to ensure the accuracy of the information provided herein, the Debtors, and their legal and financial advisors cannot, and do not, warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy.

3.   The Disclosure Statement has neither been approved nor disapproved by the Securities and Exchange Commission (U.S.) any securities regulatory authority of any state, or any Norwegian Securities regulatory or similar authority nor has the Securities and Exchange Commission (U.S.), any securities regulatory authority of any state (U.S.), or any Norwegian securities regulatory or similar authority, passed upon the accuracy or adequacy of the statements contained herein.

4.   Except as set forth in this Disclosure Statement and the Plan, no representations concerning the Debtors, their assets, past or future business operations or the Plan are authorized, nor are any such representations to be relied upon in arriving at a decision with respect to acceptance or rejection of the Plan.  Any representation made to secure acceptance or rejection of the Plan other than as contained in this Disclosure Statement should be reported to counsel for NT and the Debtors.

**B.  Voting**

**IT IS IMPORTANT THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Only holders of Claims in Classes 3B, 3C, 3D, 4.1A, 4.1B, 4.1C, 4.1D, 4.1E, 4.2A, 4.2B, 4.2C, 4.2D, 4.2E, 5A, 5B, 5C, 5D and 5E are authorized to vote on the Plan.  Pursuant to the provisions of the Bankruptcy Code, generally, only those classes of claims or interests "impaired" by a chapter 11 plan, and (i) entitled to receive a distribution under such plan are entitled to vote to accept or reject a chapter 11 plan.  Only the Claims in Classes 3B, 3C, 3D, 4.1A, 4.1B, 4.1C,4.1D, 4.1E, 4.2A, 4.2B, 4.2C, 4.2D, 4.2E, 5A, 5B, 5C, 5D and 5E are impaired by and designated to receive a distribution under the Plan and, therefore, are entitled to vote to accept or reject the Plan.  Classes 1A, 1B, 1C, 1D, 1E, 2A, 2B, 2C, 2D, 2E, 3A, and 3E are unimpaired, are conclusively deemed to have accepted the Plan, and are not entitled to vote on the Plan.  The holders of Intercompany Claims, Class 6A, 6B, 6C, 6D, 6E Claims, and Class 7A, 7B, 7C, 7D and 7E Interests are not to receive distributions under the Plan, are deemed to have rejected the Plan, and are not entitled to vote to accept or reject the Plan.

**C.  Voting Record Date**

The record date for determining the holders of Claims and Equity Interests that may vote on the Plan is _____, 2009 (the "Voting Record Date").

**D.      Ballots**

If you are a holder of an Allowed Claim in Class 3B, 3C, 3D, 4.1A, 4.1B, 4.1C ,4.1D, 4.1E, 4.2A, 4.2B, 4.2C, 4.2D, 4.2E, 5A, 5B, 5C, 5D or 5E then accompanying this Disclosure Statement is a ballot ("Ballot") for casting your vote(s) on the Plan.  A pre-addressed envelope for the return of the Ballot also is enclosed.  As noted above, Ballots for acceptance or rejection of the Plan are being provided only to holders of Claims in Classes 3, 4 and 5 because they are the only holders of Claims that may vote to accept or reject the Plan.  If you are the holder of a Claim in one of those Classes and did not receive a Ballot, received a damaged or illegible Ballot, or lost your Ballot, or if you have any questions regarding the voting procedures in respect of the Plan, please contact EPIQ Bankruptcy Solutions LLC at 757 Third Avenue, New York, NY 10017, telephone number (646) 282-2500, and facsimile number (646) 282-2501 (the "Balloting Agent").

After carefully studying this Disclosure Statement and the exhibits attached hereto, please cast your vote with respect to the Plan on the enclosed Ballot and return it pursuant to the instructions provided on the Ballot.

**E.      Voting Deadline**

In order to be counted, Ballots must be received by the Balloting Agent by 5:00 p.m. (Central Time) on [_____], 2009 (the "Voting Deadline").  Any Ballots received timely but that do not indicate either an acceptance or rejection of the Plan will be deemed to constitute an acceptance of the Plan.

**F.      Plan Acceptance**

Under the Bankruptcy Code, acceptance of a chapter 11 plan by an impaired class of Claims occurs when holders of at least two-thirds in dollar amount and more than one half in number of the Allowed Claims of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan.  Thus, for example, acceptance of the Plan by Class 6 (General Unsecured Claims) will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Claims in this Class that timely return their Ballots vote in favor of acceptance.

**G.      Invalid Votes**

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**H.      Confirmation Over Dissenting Class**

The Plan Proponents may seek to confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code even if one or more Classes of Claims do not accept the Plan.

HOUSTON 1049970v.8

## I.     Confirmation Hearing and Objection Deadline

By order dated [_____], 2009, the Bankruptcy Court fixed **[_____, 2009, at _____.m.]** (Central Time), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Avenue, 4th Floor, Houston, Texas 77002, as the date, time and place of the hearing to consider confirmation of the Plan (the "Objection Deadline"), and **[_____, 2009 at __.m.]** (Central Time) as the deadline for filing written objections to confirmation of the Plan.  The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.  Any and all objections to confirmation of the Plan must be in writing and shall be served, no later than the Objection Deadline, upon:

| Counsel to the Debtors: | Counsel to NT: |
|---|---|
| John P. Melko  (TX 13919600) | Rhett G. Campbell  (TX 03714500) |
| Amy Catherine Dinn  (TX 24026801) | Demetra L. Liggins  (TX 24026844) |
| Robert S. Blanc  (TX 2444500) | Ira L. Herman  (TX 24063314) |
| Clinton Snow  (TX 24060629) | THOMPSON & KNIGHT LLP |
| GARDERE WYNNE SEWELL LLP | 333 Clay Street, Suite 3300 |
| 1000 Louisiana, Suite 3400 | Houston, TX  77002-4499 |
| Houston, TX  77002-5011 | Telephone:  (713) 654-8111 |
| Telephone:  (713) 276-5500 | Facsimile:  (713) 654-1871 |
| Facsimile:  (713)  276-5555 | |

## III.  GENERAL INFORMATION

### A.     Brief History of the Debtors

Viking Drilling is a Norwegian company that agreed in May 2006 to purchase three out-of-service, or "stacked", semi-submersible offshore drilling rigs (collectively, the "Rigs"), including:  the VIKING PRODUCER, a Pentagon class drilling rig built in 1969 and registered under Liberian flag; the VIKING CENTURY, a Korkut class drilling rig built in 1973 and registered under Liberian flag; and the VIKING PROSPECTOR,  a Victory class drilling rig built in 1971 and registered under Marshall Islands flag.  To finance the purchase and refurbishment of the Rigs, Viking Drilling raised approximately USD $80,000,000 in equity and issued approximately USD $86 million of its Senior Secured Callable Bonds to investors in the United States and Europe.  Each of the Rigs was purchased in a separate company subsidiary in the name of the Rig:  Viking Century; Viking Producer; and Viking Prospector, respectively.   To facilitate refurbishment operations in Galveston, Texas, Viking Drilling also incorporated a Texas subsidiary, Viking Offshore.

The Debtors intended to refurbish and reactivate the three Rigs and then sell or lease them to exploration and production companies operating in the Gulf of Mexico.  Refurbishment of the VIKING PRODUCER was undertaken first.  In the meantime, VIKING CENTURY remained "cold stacked", that is, maintained with onshore supervision, on bottom in the Sabine River

between States of Texas and Louisiana.  VIKING PROSPECTOR similarly was cold stacked on bottom in Galveston, Texas.

After encountering substantial delays and cost overruns, Viking Drilling raised an additional $20 million in equity investments and issued its Second Priority Callable Bonds and raised about $122 million net of expenses to finance completion of the refurbishment of the VIKING PRODUCER and to evaluate the feasibility of refurbishing VIKING CENTURY and VIKING PROSPECTOR.  The additional $122 million was deemed insufficient by the Debtors when Viking Drilling learned that the total refurbishment cost for VIKING PRODUCER likely would exceed $300 million.  In February 2008, Viking Drilling elected to discontinue the work on VIKING PRODUCER and file petitions under Chapter 11 of the Bankruptcy Code for all of the Debtors so that their assets could be sold and the proceeds distributed to creditors.

**B.     Organizational Structure of the Debtor Companies**

Producer and Century are Liberian corporations, and Prospector is a Marshall Islands corporation; all are owned by Viking Drilling.  Offshore is a Texas corporation and a wholly owned subsidiary of Viking Drilling.  Offshore provides services for each of the rig-owning entities under a managed services agreement.

W. Dennis Heagney is the President and Chief Executive Officer ("CEO") of Viking Drilling and of Viking Offshore.  Youllonda Driver is the Chief Financial Officer ("CFO") of Viking Offshore and Controller of Viking Drilling.  Niels Erik Feilberg is the CFO of Viking Drilling.  Mr. Heagney and Ms. Driver currently work out of Offshore's Houston, Texas office, with two other employees.  Mr. Feilberg,  who is employed and paid by a company owned or controlled by Viking Drilling's Chairman, works out of the Viking Drilling office in Oslo, Norway.

**C.     Historical Financial Information**

Schedules filed by each of the Debtors in their respective Chapter 11 cases reflect the book values of the Rigs.  For VIKING PRODUCER, that value was improved by the partial refurbishment that was interrupted by the filing of its Chapter 11 case.  When the original Schedules were filed on April 15, 2008, the aggregate book value of Cash on hand and the Rigs, less intercompany advances and prepaid bond fees, was approximately $357 million.  The associated liabilities at that date were approximately $412 million.  Book values, of course, merely reflect the expenditures made rather than market values.  As discussed below, efforts to sell the Rigs have failed, and the highest offer received by the Debtors for the Rigs, owned equipment and assignment of executory contracts during the pendency of these cases was about $80 million.

The monthly operating reports filed by the Debtors reflect operating expenses of approximately $250,000 to $300,000 per month since the Petition Date.  Those expenditures have been primarily for administrative, insurance, storage costs and similar overhead and professional services, inasmuch as refurbishment activities ceased immediately before the Petition Date.

7

## IV.  THE DEBTORS' PRINCIPAL DEBT OBLIGATIONS

**A.      First Lien Loan Agreement**

On September 26, 2006, Viking Drilling entered into a Loan Agreement with NT, as Bond Trustee on behalf of the bondholders (the "Senior Holders") of the Viking Drilling ASA Senior Secured Callable Bond Issue 2006/2011 (the "Senior Loan").  The proceeds of the Senior Loan, approximately $86,000,000, were to be used to finance the refurbishment of the VIKING PRODUCER.

As security for the Senior Loan, each of Viking Offshore, Viking Producer, Viking Century and Viking Prospector guaranteed Viking Drilling's obligations pursuant to the Senior Loan documents.  Additionally, Viking Drilling pledged all of its shares in each of Viking Offshore, Viking Producer, Viking Century and Viking Prospector to the Bond Trustee, and each of Viking Producer, Viking Century and Viking Prospector granted the Bond Trustee a mortgage on their respective rigs.

**B.      Second Lien Loan Agreement**

In late February 2007, Viking Drilling arranged for a second lien loan of $60,000,000 from Pareto Securities ASA.  Once it became clear that cost overruns would require additional funding, Viking terminated the Pareto agreement without drawing any of the loan proceeds, but after paying substantial banking and commitment fees.

On December 17, 2007, Viking Drilling entered into a Loan Agreement with Norsk Tillitsmann ASA as Bond Trustee on behalf of the bondholders and warrantholders (the "Junior Holders") of the Viking Drilling ASA Second Priority Callable Bond Issue 2006/2011 with warrants (the "Junior Loan").  The proceeds of the Junior Loan, approximately $122,000,000 after expenses, were intended to complete the refurbishment of the VIKING PRODUCER and to conduct a feasibility study for the refurbishment of the VIKING CENTURY and the VIKING PROSPECTOR.

As security for the Junior Loan, Viking Drilling granted the Bond Trustee a second priority security interest in its shares of Viking Offshore, Viking Producer, Viking Century and Viking Prospector.  Further, each of Viking Producer, Viking Century and Viking Prospector granted the Bond Trustee a second priority mortgage on their respective Rigs.

Shortly after receiving in a blocked account the proceeds of the Junior Loan, Viking Drilling received an updated estimate of $308 million as the total cost of refurbishment of the Rigs.  After meeting with shareholders and potential investors, the Board of Directors of Viking Drilling decided to suspend operations and seek to reorganize the companies under the Bankruptcy Code.

On February 26, 2008, the Debtors issued a press release outlining the decision to file petitions for relief under chapter 11 of the Bankruptcy Code.  Shortly after issuance of the press release, NT issued a Notice of Default under each of the Senior and the Junior Loans.  Thereafter, and prior to the Petition Date, the Bond Trustee exercised remedies under Norwegian law, resulting in the transfer of approximately USD $124 million in funds then on deposit in the

Second Lien Pledged Account and in a First Lien Interest Reserve Account to a separate bank account owned by the Bond Trustee and held for the benefit of the Senior Holders and Junior Holders, all pursuant to the applicable documents.

**C.      Other Debt and Obligations-Maritime Liens**

Suppliers of equipment and/or services in connection with the refurbishment of the VIKING PRODUCER have asserted liens on the vessel under maritime law, in the approximate amount of $28.7 million, as reflected in proofs of claim filed by the deadline for claims. Pursuant to amended Schedules filed in August 2009, the Debtors have scheduled approximately $8 million in claims as secured by maritime liens.  The Debtors have disputed approximately $5.6 million of those claims on grounds, including defective work, overbilling or failure to satisfy statutory requirements for assertion of a maritime lien. The Plan Proponents reserve all rights with regard to such Claims.

## V.   EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

On June 19, 2006, Viking Offshore, as agent for each of Viking Producer, Viking Century and Viking Prospector entered into a Rig Refurbishment Management Agreement (the "Refurbishment Agreement") with Odin Rig Services, Inc. ("Odin").  Under the terms of the Refurbishment Agreement, Odin was charged with managing the upgrading and refurbishment of the VIKING PRODUCER, the VIKING CENTURY and the VIKING PROSPECTOR.  The refurbishment of the VIKING PRODUCER was scheduled to be completed during December of 2007.

On August 24, 2006, Offshore, doing business through Odin, entered into a Master Service Agreement ("the MSA"), with Gulf Copper & Manufacturing Corporation ("Gulf Copper").  Under the terms of the MSA, Gulf Copper was to supply certain services and products for refurbishing the Rigs,  It soon became apparent to the Board of Directors of Viking Drilling that more direct oversight of the Odin-led refurbishment project would be required because of preliminary delays and concerns over cost overruns and lack of reporting by Odin.  Effective as of January 2, 2007, the Board hired W. Dennis Heagney as Chief Executive Officer, and Youllonda D. Driver as Chief Financial Officer, of Offshore, Producer, Prospector and Century.

During the course of review of the refurbishment of the VIKING PRODUCER, Ms. Driver and Mr. Heagney discovered numerous omissions, oversights and over-expenditures by Odin. Based on meetings with Odin and an independent review, the Debtors determined, by the first week in February 2007, that costs were already approximately $55,000,000 over budget and delivery would be in May 2008, some five (5) months after the contractually agreed date of December 2007.

In late February 2007, Ole Geir Hagen, then the CFO of Viking Drilling, and Mr. Heagney negotiated a second lien loan of $60,000,000 with Pareto Securities ASA.  However, based on the discovery of cost overruns as described below, it became clear that such loan would be insufficient for Viking Drilling's needs.  As a result, Viking Drilling terminated such loan agreement without drawing on it.  Viking Drilling did, however, pay substantial investment banking and commitment fees in connection with such loan.

9

On March 22, 2007, the Refurbishment Agreement was amended and restated to account for the increase in Odin's estimates regarding the total cost of refurbishment and the completion dates for the refurbishment of each of the Rigs.  New milestone dates and progress payment dates were also set.  During this time, Offshore continued to review the construction and financial reports  related to Odin's management of the refurbishment of the Rigs.

Odin's omissions, oversights and over-expenditures continued.   Offshore discovered that Odin had erred regarding the cost to complete the VIKING PRODUCER.  On August 28, 2007, in an effort to halt Odin's continuing oversights and over-expenditures, Mr. Heagney demanded that Odin's president and owner, Mr. Ole Peter Blom, remove himself from the project.

Over the course of the next two months Offshore demanded that Odin's project manager and several of the senior engineers it had engaged also be removed from the project, and that qualified replacement personnel be engaged for the project.  Odin's new project manager and the new team continued to review Odin's documentation of the refurbishment of the VIKING PRODUCER.  Odin's new project manager determined that, in order to complete the refurbishment of the VIKING PRODUCER, additional funding would be required.

On December 17, 2007, Viking Drilling ASA entered into a Second Lien Loan Agreement with Norsk Tillitsmann ASA described above in order to finance the refurbishment of the VIKING PRODUCER.

Shortly after the closing of the Junior Loan, and after a great deal of engineering work and negotiations with Signal International, a shipyard in Pascagoula, Mississippi, Odin informed Offshore that the estimated total cost of completion of the refurbishment of the Rigs would be approximately $308,000,000.  As the Debtors had already spent about $100,000,000 of its equity and the $86,000,000 proceeds of the Senior Loan on the VIKING PRODUCER and had approximately $122,000,000 available to draw under the Junior Loan, at least an additional $100,000,000 would be required in order to complete refurbishment, plus an additional $50,000,000 for interest charges and other operating and admiralty expense.

Mr. Heagney verified Odin's estimated total cost of completion by approaching other shipyards and requesting quotations.  Based on the quotations received from other shipyards, Mr. Heagney determined that the total cost of completion of the Rigs might be even greater than the $308,000,000 Odin had estimated.

On February 13 and 14, 2008, Viking Drilling ASA's Board of Directors (the "Board") met with Odin's new project manager to discuss the additional costs of refurbishment and means for obtaining the additional funds necessary to complete refurbishment.  The Board determined that the market was not conducive to entering into a third loan agreement.  After polling the major equity holders in Viking Drilling, the Board further determined that the equity holders would be unwilling to infuse additional cash into Viking Drilling in order to complete refurbishment of the Rigs.

Unbeknownst to Viking Drilling, on February 21, 2008, Gulf Copper filed an ex parte admiralty action in the United States District Court for the Southern District of Texas, Galveston Division, over alleged current, but unpaid amounts due under the MSA.

10

On February 25, 2008, the Board, after carefully weighing the alternatives available to the Debtors, decided that an orderly sale process of the Rigs and related assets, to be effected through Chapter 11, was in the best interests of all constituencies.

On Tuesday, February 26, 2008, Viking Drilling issued a press release outlining such decision.  Shortly after issuance of the press release, the Bond Trustee issued a Notice of Default under each of the Senior and Junior Loans and took steps to block access to the Senior Debt Service Reserve account and to seize the Junior Loan proceeds.

On Friday, February 29, 2008, the Debtors filed petitions under Chapter 11 of the Bankruptcy Code.

## VI.  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

The following is a brief description of some of the significant events that have occurred during the Bankruptcy Cases.

### A.      Filing and First Day Pleadings

On the Petition Date, the Debtors sought and later obtained orders authorizing them, among other things, to continue the use of their existing cash management system.  Shortly after the Petition Date, the Debtors filed a motion requesting turnover of the VIKING PRODUCER, which had been seized and arrested by Gulf Copper prior to the Petition Date.  The Court approved the Motion and ordered Gulf Copper to release its arrest and turn over possession of the Rig to the Debtors.

### B.      Use of Cash

On the Petition Date, the Debtors had approximately $18,000,000 in unencumbered cash. Therefore, the Debtors did not need, and never attempted, to obtain debtor in possession financing.  Because the cash available to the Debtors is unencumbered, there was no need to seek permission to use "cash collateral" as would otherwise have been required under the Bankruptcy Code.

### C.      Retention of Debtors' Professionals

Prior to the commencement of the Bankruptcy Case, the Debtors retained Gardere Wynne Sewell, L.L.P. as their bankruptcy counsel for the purpose of advising them during all phases of the chapter 11 cases.

The Debtors have also retained, with Court approval, certain ordinary course professionals: (a) Niels Erik Feilberg of PriceWaterhouseCoopers, Inc. as Chief Financial Officer; (b) the Norwegian law firm of Thommessen Krefting Greve Lund AS for the purpose of providing legal advice regarding Norwegian law and its impact on the Bankruptcy Cases; (c) R.S. Platou (USA) Inc. for the purpose of marketing and brokering the sale of the rigs and related equipment; (d) Kjelstrup & Wiggen, AS to provide accounting and tax services to Debtor Viking Drilling ASA; (e) Karlins & Ramey, Inc. to provide auditing services to Viking Offshore and Viking Producer; (f) Edgar McGaughey of Pearl Meyer and Partners as Executive Compensation

11

Consultant for the purpose of reviewing proposed bonus compensation to be paid to key employees and present an opinion to the Court; (g) Van Traa Advocaten, NV, as Special Counsel for the purpose of representing the Debtors in litigation pending in Rotterdam, The Netherlands during the Cases; and (h) Robert O. Penny of Scarab Consulting as Litigation Support Consultant.  On September 1, 2009, the Court granted the Debtors' motion to retain Jhump & Associates, LLC as broker to sell the equipment not already placed on the VIKING PRODUCER.

**D.      No Appointment of Creditors' Committee**

No creditors' committee was appointed by the Office of the United States Trustee.

**E.      Real Property Leases**

Offshore leased office space located at 770 South Post Oak Lane from Rauyn Corporation pursuant to a lease agreement executed January 2, 2007.  The Debtors rejected the lease on December 17, 2008, and currently rent space at 1011 Highway 6 South, Suite 250, Houston, Texas 77077.  That lease expires on October 31, 2009.  Jhump & Associates LLC, which the Debtors have obtained approval of the Court to employ as brokers for sale of the Rig equipment, have agreed to permit Viking the use of adequate office space in Jhump's offices at 16000 Memorial Drive, Suite 250, Houston Texas 77079.

**F.      Dennis Heagney Employment Incentives and Revised Agreement**

In July 2008, the Bankruptcy Court issued its order (the "July 2008 Order") authorizing the Debtors to pay to Mr. Heagney a $175,000 bonus upon the cash sale of each Rig sold, in addition to his salary.  If the total proceeds of the liquidation of the Debtors' property exceed $80,000,000, Mr. Heagney was to receive an additional bonus equal to one percent (1%) of the total proceeds, or not less than $800,000.

In December 2008, the Bankruptcy Court authorized the Debtors to enter into a revised employment agreement with Mr. Heagney.   Effective as of January 1, 2009, the agreement provides, in material part, as follows:  (a) an annual salary of $250,000 for the calendar year 2009; (b) a bonus of $175,000 per Rig sold as provided in the July 2008 Order; (c) the threshold for payment of the one percent bonus provided in the July 2008 Order would be reduced from $80,000,000 to $75,000,000; (d) a December 31, 2009 termination date, unless extended by request of creditors under order of the Bankruptcy Court; and (e) if at that date one or more letters of intent to purchase any of the Rigs have been signed, and the sale or sales so contemplated close within one year, then the bonuses provided in the July 2008 Order and in the agreement will be paid.

In view of current market conditions, it is unlikely that any bonus will be paid under the Heagney agreement. Mr. Heagney has agreed to serve as a consultant to the Liquidating Trustees under the Liquidating Trust Agreements.  A copy of the employment agreement between Mr. Heagney and the Liquidating Trustees will be filed as a supplement to the Plan.

HOUSTON 1049970v.8

# VII.  LITIGATION

## A.  The Bodewes Litigation

Viking filed an adversary proceeding against (a) Bodewes Winches, B.V.; (b) B.V. Machine-en Lierenfabriek J.H. Bodewes; (c) Panalpina World Transport (Holding) Ltd.; and (d) Panalpina, Inc., relating to a pre-petition contract entered into by Odin Rig Services, Inc., as agent for Viking Offshore, and B.V. Machine-en Lierenfabriek J.H. Bodewes ("Old Bodewes") for the manufacture of ten mooring winches and related equipment to be used in the refurbishment of the VIKING PRODUCER.   The total purchase price of the contract was $9,545,000.00.  Viking made milestone payments of $7,158,757.00.  Soon after the Debtors filed their voluntary petitions, B.V. Machine-en Lierenfabriek J.H. Bodewes initiated insolvency proceeding in The Netherlands.  A Dutch liquidator was appointed, and he purported to sell the assets of this entity, including whatever rights he had under the Viking contract with Old Bodewes.

The purported purchaser of the assets, Bodewes Winches, B.V. ("New Bodewes"), commenced an action seeking prejudgment attachment of the winches held by Viking's freight forwarding agent in Rotterdam, and the District Court of Rotterdam granted its request.  As a result, Viking initiated this adversary proceeding in order to protect the jurisdiction of the Bankruptcy Court and to preserve assets of the bankruptcy estates for the benefit of the estates' creditors.  Upon New Bodewes' Motion, the Bankruptcy Court declined to exercise jurisdiction, leaving the case to the Dutch courts.  The Debtors have appealed that ruling and are also challenging litigation and attachment proceedings brought by New Bodewes for turnover of the winches under color of the liquidator's sale in Rotterdam.  Viking is challenging the jurisdiction of the Dutch Court and the merits of New Bodewes' claims.

## B.  The Odin Litigation

On July 22, 2009, Viking filed an adversary proceeding against its former management company, Odin Rig Services, Inc. for approximately $9.4 million in damages for breach of a managed services agreement.

## C.  The Gulf Copper and Xtreme Industries Litigation

Gulf Copper entered into a subcontract with Xtreme Industries, LLC ("Xtreme") for sand blasting and painting of the VIKING PRODUCER.  Viking discovered that Xtreme's work was substandard.  Gulf Copper stopped paying Xtreme when Viking complained about Xtreme's work.  Xtreme sued Gulf Copper for unpaid invoices in U. S. District Court (the "Xtreme Lawsuit") and filed a proof of claim asserting a maritime lien against the VIKING PRODUCER in the Debtors' bankruptcy cases.  Viking objected to the proof of claim and counterclaimed against Xtreme for damages from the substandard work in a separate adversary proceeding (the "Xtreme Adversary Proceeding").

Gulf Copper removed the Xtreme Lawsuit to the Bankruptcy Court, which consolidated it with the Xtreme Adversary Proceeding upon Viking's motion. The parties have engaged in discovery and filed cross-motions for summary judgment.  Viking's motion was granted in part so that Xtreme's maritime lien claim against the VIKING PRODUCER was disallowed.  Xtreme's

HOUSTON 1049970v.8

claims against Gulf Copper remain pending.  The outcome of this litigation will have an impact on these estates because the amount of the Xtreme claim against Gulf Copper has been included by Gulf Copper in its claim against Viking.

On June 23, 2009, however, unbeknownst to Viking, Xtreme filed a Chapter 11 petition in the United States Bankruptcy Court for the Western District of Louisiana, and then filed a suggestion of bankruptcy under applicable federal rules in the Debtors' cases, thereby staying further consideration of the cross-motions for summary judgment.  On July 22, 2009, the Debtors moved in the Xtreme case for modification of the stay to allow the Court to decide the motions for summary judgment.  Xtreme agreed to the limited stay relief sought by Viking, and an agreed order was entered in August 2009.  Viking's bankruptcy court then re-entered its Judgment and Memorandum Opinion granting Viking's Motion for Summary Judgment in part as described above.

**D.      The New Gulf Copper Litigation**

On August 24, 2007, Viking and Gulf Copper entered into a Managed Services Agreement.  Viking scheduled Gulf Copper's claim under that contract as disputed.  Viking has apprised Gulf Copper of specific objections that Viking has concerning Gulf Copper's performance under that Agreement as well as Counterclaims that Viking believes it can assert against Gulf Copper.  Viking management and counsel have engaged in numerous face to face meeting to analyze these claims individually.  Additionally, Gulf Copper has voluntarily produced a substantial number of documents in informal discovery.  To date, no resolution has been reached, though the parties continue to work toward a compromise.  Any such compromise would be submitted to the Court for approval, after notice and hearing, or depending on timing, included as an amendment to the Disclosure Statement and considered as part of the Plan Confirmation.

If the parties cannot reach a consensual resolution within the next several weeks the Debtors or the appropriate Liquidating Trustee will file a claim objection and counterclaim against Gulf Copper.

**E.      Claims Process and Bar Date**

1.      Schedules of Assets and Liabilities and Statement of Financial Affairs

On April 15, 2008, the Debtors filed their schedules of assets and liabilities and statements of financial affairs with the Court.  On May 2, 2008, the Debtors filed amended Schedules B, D, and F and amended statements of financial affairs.  On May 28, 2008, the Debtors filed amended Schedules B, D and F and an amended statement of financial affairs.  Some of the amended schedules were erroneously docketed in the member cases and were refiled in the jointly administered case on June 3, 2008.  On August 14, 2009, the Debtors filed further amended Schedules B, D, F and G in which the number and amount of maritime lien claims and executory contracts were substantially reduced.

     2.     <u>Bar Date</u>

On March 25, 2008, the Court set July 16, 2008 (the "Bar Date") as the date by which all creditors other than governmental units must file proofs of claim or be barred from asserting any Claim against the Debtors.  The bar date for governmental units was August 27, 2008.  The Debtors intend to seek an order fixing an additional bar date to file claims for creditors affected by the change in schedules who have not already filed proofs of claim.

## F.     Investigation and Avoidance Actions

The Plan Proponents are in the process of investigating litigation claims they may assert under applicable state and federal law (including, without limitation, the Bankruptcy Code).  Attached as Exhibit C to this Disclosure Statement is a list of claims, which includes names of potential adverse parties.  The claims so listed include: to recover "milestone" or progress payments to vendors that did not deliver services or goods of equivalent value; avoidance actions under the Bankruptcy Code.  Recoveries in these actions will be for the benefit of transfer to the Liquidating Trust established for the Debtor that made the avoided transfer.

## VIII.  PROPOSED SALE OF THE VIKING ASSETS

## A.     The Sale Procedures Motion and Order

The Debtors planned to enter an asset purchase agreement with a qualified buyer (the "Stalking Horse") and then afford other interested entities an opportunity to submit higher bids.  Acting through a rig broker, the Debtors solicited interest from drilling operators around the world.

Two facts then became apparent.  First, virtually all of the entities interested in buying the Viking Assets were based outside of the United States, and second, their customary business practices made them uncomfortable with entering an agreement, subject to an over-bid.  As a result, the Stalking Horse process failed to attract a qualified buyer.

Thereafter, the Debtors moved for an order permitting them to conduct an auction of the Assets.  The Debtors proposed detailed auction procedures that were adopted by the Court in its October 21, 2008 Order (the "Sale Procedures Order").  The Auction was scheduled to occur on November 12, 2008.

Unfortunately, the bidders who were reluctant to participate in a Stalking Horse process were equally reluctant to participate in an Auction process.  No qualified bidders submitted bids with deposits as required by the Sale Procedures Order.

## B.     The Sale Negotiations

During mid-November 2008 the Debtors were able to attract a bid from Grupo Rangel, a well-known Mexican energy conglomerate, of $75 million for the Assets.  Subsequent negotiations increased the offer to $80 million.  Grupo Rangel, acting through its affiliate Multiservicios Constitucion S.A. de C.V. ("Multiservicios"), submitted a letter of intent in which both parties agreed that a definitive agreement must be signed by December 12, 2008.

As the agreement deadline approached, Multiservicios conducted due diligence inquiries into the scope of the remaining work to refurbish VIKING PRODUCER. Once the extent of additional funds necessary to complete the work became clear, Multiservicios deferred executing the Memorandum of Agreement and related Assignment Agreement until financing for that work could be secured. The distressed world-wide credit markets in the last quarter of 2008 made that effort unusually difficult. Multiservicios withdrew its bid, but another Mexican entity, Dracus Group, undertook to complete the purchase transaction. After a delay of several months, Dracus Group also failed to obtain financing and to make the required deposit of $4 million.

Viking also held numerous meeting with various other groups which expressed interest in buying the Rigs and equipment. None of those discussions yielded a letter of intent.

**C.     Post-Sales-Failure Discussions**

Once it became clear that an immediate sale of the Rigs was unlikely, the Debtors and their major creditor constituencies agreed that a plan of liquidation should be prepared and filed, and that the Rigs should be transferred to Liquidating Trusts for further maintenance and eventual sale. Those discussions led to the formulation of the Plan, as discussed.

## IX.  THE PLAN

**A.     PREPARATION OF THE PLAN OF REORGANIZATION**

    1.     Negotiations Concerning the Plan of Reorganization

The Plan dated as of September 29, 2009, is the product of vigorous negotiations and discussions. These negotiations were in relation to, among other matters, the structure and governance of the Liquidating Trusts to be settled under the Plan.

THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE SUMMARY CONTAINED HEREIN, THE TERMS OF THE PLAN WILL GOVERN.

**B.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

    1.     Allowed Claims

For purposes of the Plan, a Claim against a Debtor is "allowed" under 11 U.S.C. § 502 if it is listed by a Debtor in its Schedules and not designated as "contingent," "unliquidated," or "disputed", or if it is the subject of a pending proof of claim that is not subject to an objection. For purposes of distribution under the Plan, Claims do not become Allowed Claims until the Court enters a Final Order allowing such claims and only to the extent allowed by that Final Order. Unless otherwise specified, the term "Allowed Claim" does not include (a) interest on the amount of a Claim accruing from and after the Petition Date, (b) fees and costs incurred from and after the Petition Date, (c) punitive or exemplary damages, or (d) any fine, penalty or

forfeiture.  The Estates herein reserve the right to pursue and collect setoffs or counterclaims, if any, against otherwise valid Claims.

   2.  <u>Administrative Expenses and Priority Tax Claims</u>

   As provided in § 1123(a), Administrative Expenses and Priority Tax Claims shall not be classified for purposes of voting or receiving distributions under the Plan.  Rather, all such claims shall be treated separately as unclassified claims on the terms set forth in Article V of the Plan.

   3.  <u>Classes of Claims and Interests</u>

   A Claim or Interest is in a particular Class only to the extent the Claim or Interest is an Allowed Claim or Allowed Interest as defined herein.  For purposes of organization, voting, and all confirmation matters, except as otherwise provided herein, all Claims (other than Administrative Expenses and Priority Tax Claims) and Interests shall be classified as follows:

17

## Chart 1.A - VIKING OFFSHORE

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Expenses | Paid in full in Cash | | 100% |
| -- | Priority Tax Claims | Paid in full in Cash | | 100% |
| 1A | Priority Non-Tax Claims | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 2A | Miscellaneous Secured Claims (Ad valorem taxes; M&M liens; other) | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 3A | Secured Claims (Maritime Liens) | None | No Allowed Claims | N/A |
| 4.1A | First Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 4.2A | Second Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 5A | General Unsecured Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <1% |
| 6A | Intercompany Claims | Disallowed | Impaired. Deemed to reject the Plan | 0% |
| 7A | Interests | Canceled | Impaired. Deemed to reject the Plan | 0% |

## Chart 1.B - VIKING PRODUCER

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Expenses | Paid in full in Cash | | 100% |
| -- | Priority Tax Claims | Paid in full in Cash | | 100% |
| 1B | Priority Non-Tax Claims | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 2B | Miscellaneous Secured Claims (Ad valorem taxes; M&M liens; other) | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 3B | Secured Claims (Maritime Liens) | Treated under the Liquidating Trust | Impaired. Entitled to vote | 100% |
| 4.1B | First Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 4.2B | Second Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 5B | General Unsecured Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote. | <1% |
| 6B | Intercompany Claims | Disallowed | Impaired. Deemed to reject the Plan | 0% |
| 7B | Interests | Canceled | Impaired. Deemed to reject the Plan | 0% |

18

## Chart 1.C - VIKING PROSPECTOR

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Expenses | Paid in full in Cash | | 100% |
| -- | Priority Tax Claims | Paid in full in Cash | | 100% |
| 1C | Priority Non-Tax Claims | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 2C | Miscellaneous Secured Claims (Ad valorem taxes; M&M liens; other) | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 3C | Secured Claims (Maritime Liens) | Treated under the Liquidating Trust | Impaired. Entitled to vote | 100% |
| 4.1C | First Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 4.2C | Second Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 5C | General Unsecured Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <1% |
| 6C | Intercompany Claims | Disallowed | Impaired. Deemed to reject the Plan | 0% |
| 7C | Interests | Canceled | Impaired. Deemed to reject the Plan | 0% |

## Chart 1.D - VIKING CENTURY

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Expenses | Paid in full in Cash | | 100% |
| -- | Priority Tax Claims | Paid in full in Cash | | 100% |
| 1D | Priority Non-Tax Claims | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 2D | Miscellaneous Secured Claims (Ad valorem taxes; M&M liens; other) | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 3D | Secured Claims (Maritime Liens) | Treated under the Liquidating Trust | Impaired. Entitled to vote | 100% |
| 4.1D | First Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 4.2D | Second Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 5D | General Unsecured Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <1% |
| 6D | Intercompany Claims | Disallowed | Impaired. Deemed to reject the Plan | 0% |
| 7D | Interests | Canceled | Impaired. Deemed to reject the Plan | 0% |

19

**Chart 1.E – VIKING ASA**

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Expenses | Paid in full in Cash | | 100% |
| -- | Priority Tax Claims | Paid in full in Cash | | 100% |
| 1E | Priority Non-Tax Claims | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 2E | Miscellaneous Secured Claims (Ad valorem taxes; M&M liens; other) | Paid in full in Cash | Unimpaired. Deemed to accept the Plan | 100% |
| 3E | Secured Claims (Maritime Liens) | None | No allowed claims | N/A |
| 4.1E | First Lien Bond Claims | Treated under Liquidating Trust | Impaired. Entitled to vote | <50% |
| 4.2E | Second Lien Bond Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <50% |
| 5E | General Unsecured Claims | Treated under the Liquidating Trust | Impaired. Entitled to vote | <1% |
| 6E | Intercompany Claims | Disallowed | Impaired. Deemed to reject the Plan | 0% |
| 7E | Interests | Canceled | Impaired. Deemed to reject the Plan | 0% |

## C.    TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS

1.    <u>Administrative Expenses.</u>

(a)    <u>Treatment</u>.   Unless otherwise provided for herein, each holder of an Allowed Administrative Expense (including the compensation and reimbursement of expenses of Professionals) shall be paid by the Liquidating Trustees from Liquidating Trust Assets transferred by one of the Debtors to the Liquidating Trust established with respect to such Debtor the Allowed Administrative Expense in one cash payment on the later of (i) the Effective Date (or as soon as reasonably practicable) and (ii) fifteen Business Days following the date on which such Administrative Expense becomes Allowed.

(b)    <u>General Administrative Claims</u>.   Except as otherwise set forth in this Article IV of the Plan, each holder of an Administrative Expense shall be required to file with the Bankruptcy Court, and to serve upon all parties required to receive notice, an application for allowance of such Administrative Expense on or before the Post-Confirmation Bar Date or be forever barred and discharged from doing so.   The Administrative Expenses subject to the Post-Confirmation Bar Date include (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.   An Administrative Expense with respect to which an

20

application has been properly and timely filed pursuant to this Section 4.1 of the Plan shall be treated and paid as an Administrative Expense against the estate of the Debtor with respect to which such Professional Fee Claim was incurred and only to the extent allowed by a Final Order; provided, however, that Administrative Expenses incurred and paid by any Debtor in the ordinary course during the Cases shall be deemed Allowed Expenses and the relevant claimant shall not be required to submit applications for approval and payment of such Administrative Expense.

   (c) <u>Professional Fee Claims</u>.  Each Professional whose retention with respect to the Cases has been approved by the Bankruptcy Court and who holds or asserts an Administrative Claim that is a Professional Fee Claim shall be required to File with the Bankruptcy Court, and to serve on all parties required to receive notice, a final Fee Application on or before the Post Confirmation Bar Date.  The failure to timely File the Fee Application shall result in the Professional Fee Claim being forever barred and discharged.  A Professional Fee Claim with respect to which a Fee Application has been properly and timely filed pursuant to this Section 4.1 of this Plan shall be treated and paid as an Administrative Claim only to the extent allowed by Final Order.  No Professional Fee Claims shall be allowed on account of any services rendered by a Professional whose retention with respect to the Cases has not been approved by the Bankruptcy Court.

   (d) <u>Trade Payables</u>. All trade payables and current liabilities of the Debtors, excluding payments to utility service providers, that (i) arose in the ordinary course of business on or after the Petition Date, including payroll and salaries (but excluding payroll taxes) which have accrued prior to the Effective Date but were not yet due as of the Effective Date, and (ii) otherwise qualify as Administrative Expenses shall be paid by the estate or the Liquidating Trust created with respect to the Debtor on the Effective Date (or as soon as reasonably practicable thereafter). The reasonable fees and expenses of NT, including legal fees and disbursements shall be payable in the ordinary course consistent with this section and as provided in the Plan.

   2. <u>Priority Tax Claims.</u>

   Each holder of an Allowed Priority Tax Claim may receive on account of such Allowed Priority Tax Claim from the Liquidating Trust of the Debtor against which the Claim has been asserted either (a) payment in full in Cash of such Allowed Priority Tax Claim on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (b) regular installment payments in Cash, over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim; or (c) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Liquidating Trustees, as applicable; provided, such treatment is on more favorable terms to the treatment set forth in clauses (a) and (b).  To the extent interest is required to be paid on any Allowed Priority Tax Claim, the rate of such interest shall be the rate determined under applicable non-bankruptcy law.

     3.     <u>Payment of Statutory Fees.</u>

All fees payable on or before the Effective Date (a) pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, and (b) to the United States Trustee, shall be paid in Cash in full by each of the Liquidating Trusts on the Effective Date (or as soon as reasonably practicable after such fees become due) from the Liquidating Trust of the Debtor against which the Claim has been asserted.

     4.     <u>Disallowance of Special Taxes.</u>

The issuance, transfer, or exchange of a security as defined under the Bankruptcy Code or applicable law, or the making or delivery of any instrument of transfer under this Plan, shall not be taxed under any state or local law imposing a stamp tax or similar tax as provided in § 1146.

## D.    TREATMENT OF CLASSES

     1.     <u>CLASSES 1A, 1B, 1C, 1D and 1E — Priority Non-Tax Claims.</u>

     (a)     Classes 1A, 1B, 1C, 1D and 1E shall consist of all Priority Non-Tax Claims. Each holder of an Allowed Priority Non-Tax Claim against any of the Debtors' Estates shall either (i) be paid by the Liquidating Trustees from the Liquidating Trust Assets held with respect to the appropriate Debtor, the amount of such holder's Allowed Priority Non-Tax Claim in one Cash payment equal to 100% of the amount of the Claim on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter) and (B) fifteen Business Days following the date on which the Claim becomes Allowed by a  Final Order; or (ii) receive such other less favorable treatment that may be agreed upon in writing by the Liquidating Trustees and such holder.

     (b)     Classes 1A, 1B, 1C, 1D and 1E are Unimpaired.  Holders of Allowed Claims in those Classes shall be deemed to have accepted the Plan, and votes to accept or reject the Plan will not be solicited from holders of them.

     2.     <u>CLASSES 2A, 2B, 2C, 2D and 2E — Miscellaneous Secured Claims.</u>

     (a)     Classes 2A, 2B, 2C, 2D and 2E shall consist of Miscellaneous Secured Claims. Each holder of an Allowed Class 2 Claim shall either (i) be paid by the Liquidating Trustees from the Liquidating Trust Assets held with respect to the appropriate Debtor, the amount of such holder's Claim in one Cash payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter) and (B) fifteen Business Days following the date on which the Claim becomes Allowed by a Final Order; or (ii) receive such other less favorable treatment that may be agreed upon in writing by the Liquidating Trustees and such holder.

     (b)     Classes 2A, 2B, 2C, 2D and 2E are Unimpaired.  Holders of Allowed Claims in those Classes shall be deemed to have accepted the Plan, and votes to accept or reject the Plan will not be solicited from them. Holders of Class 2A, 2B, 2C, 2D and 2E Claims shall release any and all Liens encumbering the Debtors' property at the time of payment.

22

**E.      CLASSES 3B, 3C and 3D — Secured Claims of Maritime Lienholders.**

(a)      Classes 3B, 3C, and 3D shall consist of Allowed Maritime Lien Secured Claims.  There are no Maritime Lien Secured Claims in the Viking Offshore and Viking Drilling cases because neither of those companies own rigs or equipment to which the liens could attach. Each holder of an Allowed Class 3B, 3C, and 3D Secured Claim shall either (i) be paid by the Liquidating Trustee from the appropriate Liquidating Trust the amount of such holder's Claim in one Cash payment on the latest of (A) the Effective Date (or as soon as reasonably practicable thereafter); (B) fifteen Business Days following the date on which the Claim becomes Allowed by a  Final Order; and (C) the date that the Liquidating Trust has Distributable Cash available; provided, however, that under no circumstance shall such holders receive any Distributable Cash prior to the liquidation of the Assets securing such claims, or (ii) receive such other treatment more favorable to the Debtor that may be agreed upon in writing by the Liquidating Trustee of the relevant Liquidating Trust and such holder.

(b)      Classes 3B, 3C and 3D are Impaired.  Holders of Allowed Claims in those Classes shall be entitled to vote to accept or reject the Plan.

**F.      CLASSES 4.1A, 4.1B, 4.1C, 4.1D and 4.1E and CLASSES 4.2A, 4.2B, 4.2C, 4.2D and 4.2E — Secured Claims of Bondholders.**

1.      <u>First Lien Bond Claims</u>

(a)      Classes 4.1A, 4.1B, 4.1C, 4.1D and 4.1E shall consist of holders of First Lien Bonds.  On the Effective Date, the First Lien Bond Claims shall be Allowed in the amount of the value of the collateral securing payment of  those Claims, subject to adjustment based on, among other things, any and all interest, fees, and other expenses to which the First Lien Bondholders may be entitled under the First Lien Loan Agreement and Orders of the Bankruptcy Court.  On the Effective Date (or as soon as reasonably practicable thereafter), each holder of an allowed First Lien Bond Claim shall be paid by the appropriate Liquidating Trustee an initial Cash distribution from Distributable Cash.

(b)      The Liquidating Trustees shall make subsequent Cash distributions equal to a holder's Ratable Proportion if, as and when there is sufficient Distributable Cash, after payment of Allowed Class 1A, 1B, 1C, 1D and 1E  Secured Claims, Allowed Class 2A, 2B, 2C, 2D and 2E Secured Claims, Allowed Class 3B, 3C and 3D Secured Claims and costs incurred with respect to administration of the Liquidating Trusts to make such a distribution, all in accordance with the terms of the Plan and the Liquidating Trust Agreement.

(c)      If the amounts distributed under subsections (a) and (b) exceed 100% of the Allowed Class 4.1A, 4.1B, 4.1C, 4.1D and 4.1E Secured Claims, then each holder of such a Claim will be entitled to receive such interest and other payments as may be required under the First Lien Loan Agreement up to the lesser of (i) the amount of the remaining Distributable Cash, and (ii) all amounts due under that Agreement.

(d)      Classes  4.1A, 4.1B, 4.1C, 4.1D and 4.1E are Impaired.  Holders of Allowed Class 4.1 Secured Claims shall be entitled to vote to accept or reject the Plan.

23

2.      Second Lien Bond Claims

(a)      Classes 4.2A, 4.2B, 4.2C, 4.2D and 4.2E shall consist of holders of Second Lien Bonds. On the Effective Date, the Second Lien Bond Claims shall be Allowed in the amount of the value of the collateral securing payment of those Claims, subject to adjustment based on, among other things, any and all interest, fees, and other expenses to which the Second Lien Bondholders may be entitled under the Second Lien Loan Agreement and Orders of the Bankruptcy Court.  On the Effective Date (or as soon as reasonably practicable thereafter), each holder of an allowed Second Lien Bond Claim shall be paid by the appropriate Liquidating Trustee from the Liquidating Trust Assets an initial Cash distribution from Distributable Cash.

(b)      The Liquidating Trustees shall make a subsequent Cash distribution equal to the holder's Ratable Proportion if, as and when there is sufficient Distributable Cash, after payment of Allowed Class 1A, 1B, 1C, 1D and 1E Secured Claims, Allowed Class 2A, 2B, 2C, 2D and 2E Secured Claims, Allowed Class 3B, 3C and 3D Secured Claims, and Allowed Class 4.1A, 4.1B, 4.1C, 4.1D and 4.1E Secured Claims and the costs incurred with respect to administration of the Liquidating Trusts to make such a distribution, all in accordance with the terms of the Plan and the Liquidating Trust Agreement.

(c)      If the amounts distributed under subsections (a) and (b) exceed 100% of the Allowed Class 4.2 Secured Claims, then each holder of such a Claim will be entitled to receive such interest and other payments as may be required under the Second Lien Loan Agreement up to the lesser of (i) the amount of the remaining Distributable Cash, and (ii) all amounts due under that Agreement.

(d)      Classes 4.2A, 4.2B, 4.2C, 4.2D and 4.2E are Impaired.  Holders of Allowed Class 4.2A, 4.2B, 4.2C, 4.2D and 4.2E Secured Claims shall be entitled to vote to accept or reject the Plan.

## G.      CLASSES 5A, 5B, 5C, 5D and 5E —General Unsecured Claims.

(a)      Classes 5A, 5B, 5C, 5D and 5E shall consist of General Unsecured Claims of the respective Debtors.  Each holder of an Allowed General Unsecured Claim against any of the  Estates shall receive in exchange for and in full satisfaction of such Claim its Pro Rata share of: (i) the assets of the Liquidating Trust settled with respect to the Debtor against which such claim is allowed on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter) and (B) the date such Claim becomes an Allowed Claim by Final Order, and (ii) Distributions of Available Cash on account of such Claim, subject to other applicable terms of the Plan and the Liquidating Trust Agreement.

(b)      Classes 5A, 5B, 5C, 5D and 5E are Impaired.  Holders of Allowed General Unsecured Claims shall be entitled to vote to accept or reject the Plan.

## H.      CLASSES 6A, 6B, 6C, 6D and 6E —Intercompany Claims.

(a)      Classes 6A, 6B, 6C, 6D and 6E shall consist of all Allowed Claims between or among the Debtors. No distributions shall be made in respect of those Claims.

24

(b)      Holders of Intercompany Claims shall not be entitled to receive any Distributable Cash.

(c)      Classes 6A, 6B, 6C, 6D and 6E are Impaired.  Holders of Class 6A, 6B, 6C, 6D and 6E Claims shall be deemed to have rejected the Plan , and votes to accept or reject the Plan will not be solicited from holders of Intercompany Claims.

**I.      CLASSES 7A, 7B, 7C, 7D and 7E — Holders of Equity Interests in the Debtors.**

(a)      Classes 7A, 7B, 7C, 7D and 7E shall consist of the Allowed Interests in the Debtors.  All Interests shall be canceled and extinguished on the Effective Date.

(b)      Holders of Equity Interests in the Debtors shall not be entitled to receive any Distributable Cash or retain any property under this Plan.

(c)      Classes 7A, 7B, 7C, 7D and 7E are Impaired.  Holders of Interests shall be deemed to have rejected the Plan, and votes to accept or reject the Plan will not be solicited from such holders.

**J.      CONDITIONS PRECEDENT TO OCCURRENCE OF THE EFFECTIVE DATE**

1.      <u>Conditions Precedent to Consummation of the Plan.</u>

In addition to any other conditions set forth in this Plan, the following are conditions precedent to the occurrence of the Effective Date:

(a)      The Confirmation Order, in a form and substance reasonably acceptable to the Plan Proponents and which shall include one or more findings that the Plan Proponents herein acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall have been entered and become a Final Order in form and substance satisfactory to NT and to the Trust Oversight Committees;

(b)      The Liquidating Trust Agreement and all other related documents shall have been fully executed;

(c)      The Liquidating Trustees shall be identified by the Trust Oversight Committees;

(d)      The Bankruptcy Court shall have determined that the Liquidating Trustees are or will be duly authorized to take the actions contemplated by this Plan and the Liquidating Trust Agreement, which approval and authorization may be set forth in the Confirmation Order; and

(e)      A SINGLE ENTITY WILL BE APPOINTED LIQUIDATING TRUSTEE FOR ALL OF THE LIQUIDATING TRUSTS CREATED UNDER THIS PLAN AND A SINGLE GROUP OF ENTITIES WILL SERVE AS THE TRUST OVERSIGHT COMMITTEES TO BE APPOINTED UNDER THIS PLAN, SUBJECT TO MEETING THE

REQUIREMENTS OF THE NORWEGIAN PUBLIC LIMITED COMPANIES ACT CONCERNING THE DISSOLUTION OF VIKING DRILLING.

## K.   PLAN IMPLEMENTATION

   1.   Creation of the Liquidating Trusts.

   On the Effective Date, each of the Liquidating Trusts described herein shall be formed pursuant to this Plan and the Liquidating Trust Agreement.  The Liquidating Trustees shall take such actions as are necessary under applicable law to effect the terms and provisions of the Plan and the Liquidating Trust Agreement, including without limitation the winding up of the affairs of the Debtors under applicable law.

   2.   Transfer of Liquidating Trusts' Assets.

   On the Effective Date, each Debtor shall transfer all of the right, title and interest in its assets to the Liquidating Trust established under this Plan to receive each individual Debtor's assets, including and not by way of limitation, title to the VIKING PRODUCER, VIKING PROSPECTOR and VIKING CENTURY, together with all equipment on board or in storage facilities.

   3.   Plan is Motion to Transfer Liquidating Trusts' Assets.

   The Plan shall be considered a motion pursuant to Bankruptcy Code §§ 105, 363, and 365 to transfer and assign to, and vest in, the respective Liquidating Trusts any and all Liquidating Trust Assets as of the Effective Date.  Any objections to such transfer, assignment, and vesting must be made as a timely written objection to Confirmation of the Plan, to be heard at the Confirmation Hearing.

   After the Effective Date, the Liquidating Trustees may present an order or orders to the Bankruptcy Court, suitable for filing in the records of every county or governmental entity, subdivision and agency where any Liquidating Trust Assets were or are located, providing that such property has been conveyed to the appropriate Liquidating Trust.  The order or orders may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned and vested.  This Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished, and no notice, other than by this Plan, shall be given prior to the presentation of such order.  Any Person having a Lien, Claim, encumbrance, or other interest against any Liquidating Trust Assets shall be conclusively deemed to have consented to the transfer, assignment, and vesting of such Liquidating Trust Assets to the appropriate Liquidating Trust by failing to object to confirmation of this Plan, except as otherwise provided in this Plan.

   4.   Termination of Directions, Officers, and/or Managers of the Debtors.

   On the Effective as of the Effective Date, all of the directors, officers, and/or managers of the Debtors shall be deemed terminated.

5.      Corporate Existence.

On the Effective Date, or as soon thereafter as deemed appropriate by the Liquidating Trustees, all Debtors, except for Viking Drilling, shall be deemed dissolved for all purposes without the necessity for any further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Liquidating Trustees shall file with the appropriate authorities a certificate of cancellation of the corporate charter of each of the Debtors.  From and after the Effective Date, neither the Liquidating Trustees nor the Debtors shall be required to file any document, or take any other action, to withdraw its business operation from any state or county in which a Debtor previously conducted its business operations.

Viking Drilling and the Liquidating Trustee of Viking Drilling will follow appropriate procedures under the Norwegian Public Limited Companies Act (the "Act") to dissolve Viking Drilling.

6.      Employee Benefit Plans.

All employee benefit plans, policies and programs implemented by the Debtors and not previously terminated by the Debtors or otherwise addressed by a separate Final Order as of the Effective Date shall be terminated as of the Effective Date.  Except as otherwise provided in the Plan, employee benefit plans, policies, and programs shall include all health care plans, disability plans, severance benefit plans, life, accidental death and dismemberment insurance plans (to the extent not executory contracts assumed under the Plan) and pension/retirement plans, but shall exclude all employees' equity or equity-based incentive plans, which are Interests that shall be canceled pursuant to the terms hereof.  If the termination of any such plan, policy or program gives rise to a Claim by an employee, such Claim, to the extent that it is not timely Filed, shall be forever barred and shall not be enforceable against the Debtors or their Estates, affiliates, successors, estates or properties, unless a proof of Claim is Filed and served on the Liquidating Trustees within thirty (30) days after the Effective Date.

7.      Cancellation and Surrender of Existing Securities; Cancellation of Indentures.

(a)      Cancellation of Existing Securities and Agreements.  On the Effective Date, all promissory notes, stock certificates or other instruments evincing a Claim or Interest shall be canceled and the holders thereof shall have no rights by reason thereof, and such instruments shall evince no rights, except the right to receive the distributions, if any, to be made to holders of such instruments under the Plan and the Liquidating Trust Agreement.

(b)      Surrender of Existing Securities.  As a condition to receiving any distribution under the Plan and the Liquidating Trust Agreement, each holder of a promissory note, stock certificate, or other instrument evidencing a Claim or Interest must surrender such promissory note, stock certificate, or other instrument to the Liquidating Trustees.

8.      Release of Liens and Perfection of Liens.

All valid liens against any of the property transferred to the Liquidating Trusts shall remain in full force and effect, provided however, that the Confirmation Order shall grant the

Liquidating Trustees full authority to provide the buyers of such assets full legal title, free and clear from all liens, claims, encumbrances or interests in the assets sold, with any such lien, claim, encumbrance or interest attaching to the proceeds. As a condition to the distribution of funds, a Lienholder shall provide the relevant Liquidating Trustee with an appropriate release of lien in recordable form, including without limitation, mortgage satisfaction document, UCC Form-3 Statements and the like.

9.      Further Transactions.

On the Effective Date, the Liquidating Trustees and each Debtor, as applicable, shall execute and deliver such further documents, instruments and agreements as are necessary to effectuate and further evidence the terms and conditions of the Plan and give effect to the Liquidating Trust Agreement.

10.      Entry of Final Decree.

As soon as is practicable after the last Distribution Date with respect to assets held in any one or more of the Liquidating Trusts, the Liquidating Trustees shall File an application with the Clerk of the Court requesting the entry of a final decree closing the Cases.

11.      Retention of Rights to Pursue Causes of Action.

(a)      Pursuant to § 1123(b)(3), as of the Effective Date, the Liquidating Trustees shall retain and have the exclusive right to enforce against any Entity any and all Causes of Action (including Chapter 5 Causes of Action) that otherwise belong to a Debtor, including all Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code, other than those expressly released or compromised as part of or pursuant to the Plan or by other order of the Bankruptcy Court entered prior to the Effective Date. The Causes of Action retained hereby include, without limitation, all Claims and Causes of Action listed in Exhibit C to this Disclosure Statement.

(b)      The Liquidating Trustees (as representative of the Estates) shall retain and may prosecute and enforce all defenses, counterclaims, and rights that have been asserted or could be asserted by a Debtor against or with respect to all Claims asserted against the Debtors or property of the Estates. No claim, right, Cause of Action, or other asset shall be deemed waived or otherwise forfeited by virtue of a Debtor's failure to identify such property in the Debtor's Schedules or the Disclosure Statement accompanying the Plan unless otherwise ordered by the Bankruptcy Court.

(c)      In this connection, the Liquidating Trustees shall continue to review payments made by and transactions involving the Debtors prior to the Petition Date to determine whether Chapter 5 Causes of Action to avoid such payments and transactions should be brought. Failure to specifically identify potential actions in the Plan of Disclosure Statement shall not be deemed a waiver of any such action by the Debtors or any other party.

28

L.      **THE LIQUIDATING TRUSTS AND THE LIQUIDATING TRUSTEES**

1.      The Liquidating Trusts.

The Liquidating Trusts are created for the purpose of liquidating the Liquidating Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d) and making the Distributions to certain holders of Allowed Claims, and the Liquidating Trusts are not otherwise authorized to engage in any trade or business.  The Beneficiaries of the Liquidating Trusts will be treated as the grantors and deemed owners.  Each Liquidating Trustee appointed under this Plan shall file federal income tax returns for each Liquidating Trust as a grantor trust pursuant to § 671 of the Internal Revenue Code of 1986, as amended, and the Federal Income Tax Regulations promulgated thereunder.

2.      Funding of Res of the Trusts.

To fund the Liquidating Trusts, the Liquidating Trustees shall take possession of, and have title to, all the Liquidating Trust Assets as of the Effective Date.  The conveyances of all Liquidating Trust Assets shall be accomplished pursuant to the Plan and the Confirmation Order and shall be effective upon the Effective Date, without the need of further documentation or instruments of conveyance.   Upon the Effective Date, the Liquidating Trusts also shall be deemed to have taken assignments of bank accounts containing Cash in the possession of the Debtors and the Estates, and an assignment, bill of sale, deed and/or release covering all other Liquidating Trust Assets.  The Liquidating Trustees may present such Orders to the Bankruptcy Court as may be necessary to require third parties to accept and acknowledge such conveyance to the Liquidating Trusts.  Such Orders may be presented without further notice other than as given in or pursuant to the Plan.

For all federal income tax purposes, all Persons (including, without limitation, the Debtors, the Liquidating Trustees, the Trust Oversight Committees, and the holders of Allowed and Disputed Claims) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trusts as in accordance with the terms of the Plan.

3.      The Liquidating Trustees.

The Liquidating Trustees shall retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under this Plan and Liquidating Trust Agreement, and as otherwise provided in the Confirmation Order. The Liquidating Trustees shall be the exclusive trustees of the Liquidating Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).  The Liquidating Trustees shall be designated by the Trust Oversight Committees not less than five (5) business days before the Confirmation Hearing. Subject to the Bankruptcy Court's approval at the Confirmation Hearing, the Persons to be designated by the Trust Oversight Committees to serve as the Liquidating Trustees shall serve as Liquidating Trustees. Matters relating to the appointment, removal and resignation of Liquidating Trustees and the appointment of any successor Liquidating Trustees shall be set forth in the Liquidating Trust Agreement, provided that the Liquidating Trust Agreement shall authorize the Trust Oversight Committees in each Debtor's case, in its sole discretion, to remove the Liquidating Trustees, at

any time.  The Liquidating Trustees shall be required to perform his or her duties as set forth in this Plan and the Liquidating Trust Agreement.

4.      Retention of Professionals.

The Liquidating Trustees shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Liquidating Trustees, are necessary to assist the Liquidating Trustees in the performance of their duties in connection with each individual Liquidating Trust.  The reasonable fees and expenses of such professionals shall be paid by the appropriate Liquidating Trustee upon the monthly submission of statements to the Liquidating Trustees. The payment of the reasonable fees and expenses of the Liquidating Trustees' retained professionals shall be made in the ordinary course of business from the property of the Liquidating Trust for which such services were provided and shall not be subject to the approval of the Bankruptcy Court.  The Liquidating Trustees shall have the discretion to allocate the reasonable fees and expenses of the retained Professional among the Liquidating Trusts.  The Liquidating Trustees shall employ their business judgment when making such allocation.  Professionals of, among others, the Debtors and Bond Trustee, shall be eligible for retention by the Liquidating Trustees.

5.      Compensation of the Liquidating Trustees.

The compensation of the Liquidating Trustees, on a post-Effective Date basis, shall be determined by the Trust Oversight Committees.  The payment of the fees of the Liquidating Trustees and any professionals retained by the Liquidating Trustees shall be made in accordance with the Liquidating Trust Agreement.

6.      Liquidating Trusts Expenses.

Subject to the provisions of each Liquidating Trust Agreement, all costs, expenses and obligations incurred by the Liquidating Trustees in administering this Plan, each Liquidating Trust or in any manner connected, incidental or related thereto, in effecting distributions from each Liquidating Trust (including the reimbursement of reasonable expenses) shall be a charge against the Liquidating Trust Assets of the affected Liquidating Trust remaining from time to time.  Such expenses shall be paid as they are incurred, and in the ordinary course, without the need for Bankruptcy Court approval.

7.      Liability; Indemnification.

The Liquidating Trustees shall not be liable for any act or omission taken or omitted to be taken in their capacity as the Liquidating Trustees, other than acts or omissions resulting from such Person's willful misconduct, gross negligence or fraud. The Liquidating Trustees may, in connection with the performance of their functions, and in their sole absolute discretion, consult with attorneys, accountants and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals.  Notwithstanding such authority, the Liquidating Trustees shall be under no obligation to consult with attorneys, accountants or their agents, and their determination to not do so should not result in imposition of liability on the Liquidating Trustees unless such determination is based on willful misconduct, gross negligence or fraud.  The Liquidating Trusts

30

shall indemnify and hold harmless the Liquidating Trustees and their agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trusts or the implementation or administration of this Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

8.      Termination.

The duties, responsibilities and powers of the Liquidating Trustees shall terminate after all Liquidating Trust Assets, including Causes of Action transferred and assigned to the appropriate Liquidating Trust or involving the Liquidating Trustees on behalf of the appropriate Liquidating Trust, are fully resolved, abandoned or liquidated and the available Cash has been distributed in accordance with this Plan and the Liquidating Trust Agreement.  Except in the circumstances set forth below, each Liquidating Trust shall terminate no later than three years after the Effective Date.  However, if warranted by the facts and circumstances provided for in this Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of one of the Liquidating Trusts, the term of such Liquidating Trust may be extended one or more times (not to exceed a total of four extensions, unless the Liquidating Trustees receive a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the affected Liquidating Trust as a grantor trust for federal income tax purposes) for a finite period, not to exceed six months, based on the particular circumstances at issue.  Each such extension must be approved by the Bankruptcy Court within two months prior to the beginning of the extended term with notice thereof to all of the unpaid beneficiaries of such Liquidating Trust.  Upon the occurrence of the termination of any one or more of the Liquidating Trusts, the Liquidating Trustee, with respect to such terminated Liquidating Trust, shall File with the Bankruptcy Court a report thereof and seek an order discharging such Liquidating Trustee.

9.      Authority of the Liquidating Trustees.

On and after the Effective Date, the Liquidating Trustees, shall be authorized to take all actions necessary to execute and deliver all Plan Documents issued or entered into pursuant to the Plan and each of the Liquidating Trust Agreement.

10.     Approval of Agreements.

Entry of the Confirmation Order shall constitute approval of the Plan Documents, including, without limitation, the Liquidating Trust Agreement, and such transactions and authorization for the Liquidating Trustees, as appropriate, to execute and deliver each of the Plan Documents, including, without limitation, the Liquidating Trust Agreement.

HOUSTON 1049970v.8

**M.     TRUST OVERSIGHT COMMITTEES**

    1.     Creation of Trust Oversight Committees.

        On the Effective Date, the Creditors holding Allowed Claims in Classes 4.1A, 4.1B, 4.1C, 4.1D, 4.1E, 4.2A, 4.2B, 4.2C, 4.2D, and 4.2E shall appoint at least three, but no more than five Persons as members of the Trust Oversight Committees to oversee the Liquidating Trusts, subject to the Bankruptcy Court's approval, before the conclusion of the Confirmation Hearing; provided, however, that with respect to the Viking Drilling Liquidating Trust, it may be necessary to establish a separate Trust Oversight Committee comprised of different members to comply with Norwegian laws regarding residency and gender.

        In the event that any member of a Trust Oversight Committee (i) sells, transfers or assigns all of its Liquidating Trust Interests or (ii) receives full satisfaction of its Allowed Claim, such member immediately shall be resign or be removed from such Trust Oversight Committee. In such an event, the remaining members of such Trust Oversight Committee shall appoint a replacement member.

    2.     Duties and Responsibilities.

        The duties and responsibilities of the Trust Oversight Committees shall be set forth in the Liquidating Trust Agreement.

    3.     Duration.

        The Trust Oversight Committees shall remain in existence for a reasonable time, following the time of the final Cash distribution to holders of Allowed Claims under this Plan by the Liquidating Trusts.

    4.     Compensation and Expenses.

        The members of the Trust Oversight Committees shall serve without compensation for their performance of services, except that they shall be entitled to reimbursement of reasonable expenses from the appropriate Liquidating Trust without further order of the Bankruptcy Court.

    5.     Liability; Indemnification.

        Neither the Trust Oversight Committees, nor any of their members, or designees, nor any duly designated agent or representative of the Trust Oversight Committees, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Trust Oversight Committees, nor shall any member of the Trust Oversight Committees be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Trust Oversight Committees, other than acts or omissions resulting from such member's willful misconduct, gross negligence or fraud.  The Trust Oversight Committees may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with attorneys, accountants, and its agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals.  Notwithstanding such authority, the Trust Oversight Committees shall be

HOUSTON 1049970v.8

under no obligation to consult with attorneys, accountants or their agents, and its determination to not do so shall not result in the imposition of liability on the Trust Oversight Committees, or any of their members and/or designees, unless such determination is based on willful misconduct, gross negligence or fraud.  Each Liquidating Trust shall indemnify and hold harmless the Trust Oversight Committees and their members, designees, and Professionals, and any duly designated agent or representative thereof (in their capacity as such), from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions with respect to such Liquidating Trust or the implementation or administration of this Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

## N.   DISPUTED CLAIMS, DISPUTED INTERESTS, AND MISCELLANEOUS DISTRIBUTION PROVISIONS

1.   Objections.

An objection to the allowance of a Claim shall be in writing and may be filed only by the Liquidating Trustees, at any time on or before the Claims Objection Deadline.  The Liquidating Trustees, on behalf of their respective Liquidating Trust, may prosecute any such objection until determined by a Final Order, unless the respective Liquidating Trustee (a) compromises and settles such objection to a Claim or Interest by written stipulation subject to Bankruptcy Court approval, if necessary, or (b) withdraws such objection.

2.   Amendments to Claims; Claims Filed After the Confirmation Date.

Except as otherwise provided in the Plan, after the Confirmation Date, a Claim may not be Filed or amended without the authorization of the Bankruptcy Court, and, even with such Bankruptcy Court authorization, may be amended by the holder of such Claim solely to decrease, but not to increase, the Face Amount thereof.  Except as otherwise provided in the Plan, any new or amended Claim Filed after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Liquidating Trustees.

3.   Power to Compromise and Settle Without Notice and a Hearing

The Liquidating Trustees may compromise and settle a claim against a party defendant without notice and a hearing thereon when the amount to be received will be $50,000 or less, and may settle an objection to a Claim without notice and a hearing thereon where the Allowed Claim will be $50,000 or less as a result of such compromise and settlement.  The Liquidating Trustees may also compromise and settle an objection to a Claim without notice and a hearing thereon when the difference between the amount of the proof of claim as filed and the amount of the Claim as scheduled by the Debtors is less than $50,000.

4.   Power to Compromise and Settle Upon Notice and a Hearing

The Liquidating Trustees may compromise and settle all claims against party defendants and Objections to Claims not governed by the Plan only upon twenty (20) days' notice to the

33

United States Trustee for the Southern District of Texas and such other parties as may be specified in the Confirmation Order, and upon a hearing thereon if required.

     5.     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to any Claim held by the holder of a Disputed Claim to which an objection has been interposed unless and until the Disputed Claim has been settled, withdrawn or adjudicated and a Final Order has been entered with respect to the Claim.

     6.     Distributions.

The Liquidating Trustees shall make distributions from each individual Liquidating Trust to the beneficiaries of such Liquidating Trust from time to time as set forth in the Liquidating Trust Agreement.

     7.     Disputed Claim Reserves.

     (a)     Reserve for Disputed Claims.  The Liquidating Trust Agreement shall require a reserve for the account of each holder of a Disputed Claim in a Disputed Claim Reserve Account for the affected Class (i) property that would otherwise be distributable to such holder on such date were such Disputed Claim an Allowed Claim on such date or (ii) such other property as may be agreed upon between the holder and the Liquidating Trustee.  To the extent a Disputed Claim becomes an Allowed Claim, property of a Liquidating Trust reserved for the holder thereof shall be distributed by the Liquidating Trustee to such holder as soon as practicable after such Claim becomes an Allowed Claim pursuant to, and to the extent provided for in, the Liquidating Trust Agreement.  To the extent an objection to a Disputed Claim is upheld or a Claim is withdrawn or reduced, the reserves held on account of such Disputed or withdrawn Claim shall be reallocated pro rata among Allowed Claims and Disputed Claims, and the portion allocable to Allowed Claims shall be paid to the holders thereof on the next distribution Date until all Allowed Claims have been paid in full.

     (b)     Reserved Amounts and Estimations.  For purposes of creating reserves providing for the distributions of Cash to holders of Allowed Claims, upon a request for estimation by a Liquidating Trustee, the Bankruptcy Court may determine the amount of Cash sufficient to reserve on account of any Disputed Claim, pursuant to § 502 or other applicable law, in which event the amount so determined will be reserved on account of such Disputed Claim, or, in lieu thereof, the Bankruptcy Court will determine the maximum amount for such Disputed Claim, and that amount will be the maximum amount in which such Claim may ultimately be Allowed, if such Claim becomes Allowed in whole or in part.  If no such estimation is requested with respect to a liquidated Disputed Claim, the Liquidating Trustee for the affected Liquidating Trust will reserve Cash in the Disputed Claim Reserve Account based on the Face Amount of such Claim until the Claim is Allowed by an order of the Bankruptcy Court, at which time the reserve amount pending a Final Order may be the amount so Allowed.

8.      Undeliverable or Unclaimed Distributions.

(a)      Any Entity entitled to receive a Cash distribution but that fails to present a check within 120 days of its issuance shall be entitled to receive a reissued check from the appropriate Liquidating Trustee for the amount of the original check, without any interest, if such Entity requests such Liquidating Trustee to reissue such check and provides such documentation as may be requested to verify that such Entity is entitled to such check prior to the later of (a) the first anniversary of the Effective Date and (b) six (6) months after such Entity's Claim becomes an Allowed Claim.  If an Entity fails to present a check within 120 days of its issuance and fails to request reissuance of such check prior to the later to occur of (a) the first anniversary of the Effective Date, (b) six (6) months following the date such Entity's Claim becomes an Allowed Claim, or (c) for any distribution issued more than two years after the Effective Date, 180 days following the date of issuance, such Entity shall not be entitled to receive any distribution with respect to the amount of such check.  If the distribution to any holder of an Allowed Claim is returned to a Liquidating Trustee as undeliverable, no further distributions will be made to such holder unless and until that Liquidating Trustee is notified in writing of such holder's current address; provided, however, that the Liquidating Trustee shall make reasonable business efforts to contact the holder of such Allowed Claim, identify the correct mailing address and resend the distribution.

(b)      All Claims for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date and (ii) six (6) months following the date such Entity's Claim becomes an Allowed Claim.  After such date, all unclaimed property shall revert to the appropriate Liquidating Trust, and the Claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

9.      Allocation of Consideration.

The aggregate consideration to be distributed to a holder of an Allowed Claim shall be treated as first satisfying an amount equal to the stated principal amount of such Allowed Claim and any remaining consideration as satisfying Allowed accrued but unpaid interest, if any, thereon.

10.      Transmittal of Distributions and Notices.

(a)      Any property or notice other than Cash distributions that an Entity is or becomes entitled to receive pursuant to the Plan shall be delivered by regular mail, postage prepaid, in an envelope addressed to that Entity at the address stated on any notice of appearance Filed by that Entity or its authorized agent prior to the Effective Date.  If no notice of appearance has been Filed, notice shall be sent to the address indicated on a properly Filed proof of Claim or, absent such a proof of Claim, the address that is listed on the Schedules for that Entity.  The date of distribution shall be the date of mailing, and property distributed in accordance with this Section shall be deemed delivered to such Entity regardless of whether such property is actually received by that Entity.

(b)    A holder of a Claim or Interest may designate a different address for notices and distributions by notifying the appropriate Liquidating Trustee of that address in writing.  The new address shall be effective upon receipt of the notice by such Liquidating Trustee.

11.    <u>Method of Cash Distributions.</u>

Any Cash payment to be made pursuant to the Liquidating Trust Agreement may be made, at the option of the Liquidating Trustees, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.

12.    <u>Distributions on Non-Business Days.</u>

Any distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

13.    <u>Withholding Taxes.</u>

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All Entities holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

14.    <u>Set-offs.</u>

Except as otherwise provided in the Plan, agreements entered into in connection with the Plan, the Confirmation Order, or in agreements previously approved by Final Order of the Bankruptcy Court, the Liquidating Trustees may, but shall not be required to, setoff against any Claim and the distributions to be made with respect to the Claim, before any distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that a Debtor may hold against the holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, any other action or omission of a Debtor or the Liquidating Trustees, nor any provision of the Plan, shall constitute a waiver or release by a Debtor or the Liquidating Trustees of any such claims, rights and Causes of Action that a Debtor or the Liquidating Trustees may possess against such holder. To the extent a Debtor or the Liquidating Trustees, fail to setoff against a holder of a Claim or Interest and seek to collect a claim from the holder of such Claim or Interest after a distribution to the holder of such Claim or Interest pursuant to the Plan or the relevant Liquidating Trust Agreement, the relevant Liquidating Trustee shall be entitled to full recovery on its claim, if any, against the holder of such Claim or Interest.

## O.    EXECUTORY CONTRACTS AND LEASES

1.    <u>Rejection of Executory Contracts.</u>

(a)    On the Effective Date, all executory contracts and unexpired leases to which a Debtor is a party shall be automatically rejected by the Debtors without further notice or order.

(b)     The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to § 365, effective as of the Petition Date.  Any party to an executory contract or unexpired lease identified for rejection as provided herein may, within the same deadline and in the same manner established for Filing objections to Confirmation, file any objection thereto.  Failure to file any such objection by the Objection Deadline shall constitute consent and agreement to the rejection.

2.     <u>Bar Date for Rejection Damages.</u>

If the rejection of an executory contract or unexpired lease gives rise to a Claim by the other party or parties to such contract or lease, such Claim, to the extent that it is timely Filed and is a General Unsecured Claim, shall be classified in the appropriate Debtors case in Class 5A, 5B, 5C, 5D or 5E as may be appropriate; provided, however, that in either event any Claim arising from the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Debtors, their Estates, affiliates, successors, properties, or the affected Liquidating Trust unless a proof of Claim is Filed and served on the Liquidating Trustees within thirty (30) days after the Effective Date.

**P.     RELEASES; INDEMNIFICATION; PLAN INJUNCTION**

1.     <u>Releases; Indemnification.</u>

(a)     Except as otherwise specifically provided by the Plan, the distributions and rights that are provided in the Plan and the Liquidating Trust Agreement shall be in complete satisfaction and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date) of (i) all Claims and Causes of Action against, liabilities of, liens on, obligations of and Interests in the Debtors and the assets and properties of the Debtors, whether known or unknown, and (ii) all Causes of Action (whether known or unknown, either directly or derivatively through the Debtors) against, Claims (as defined in § 101 of the Bankruptcy Code) against, liabilities (as guarantor of a Claim or otherwise) of, Liens and obligations of successors and assigns of, the Debtors and their successors and assigns based on the same subject matter as any Claim or Interest or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was Filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on the Plan.  Notwithstanding the foregoing, valid security interests and liens against assets transferred to the Liquidating Trusts shall remain in full force and effect, subject to each Liquidating Trustee's rights to release such liens upon the sale of the underlying assets.

(b)     On the Effective Date, the Debtors and the Estates shall be deemed to release, indemnify and hold harmless each present and former director and officer (including W. Dennis Heagney, Youllonda Driver, Niels Erik Feilberg, Ole Geir Hagen and Erik Wahlstrom), consultant, financial adviser, attorney, accountant and other representative of the Debtors (the "Indemnified Persons"), from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon or related

to any act or omission, transaction, event or other occurrence taking place on or at any time from the Petition Date through and including the Effective Date in any way relating to the Debtors, the Cases or the Plan, except that no Indemnified Person shall be released from acts or omissions which are the result of willful misconduct or gross negligence.  The foregoing provisions are an integral part of the Plan and are essential to its implementation.  If and to the extent that the Bankruptcy Court concludes that the Plan cannot be confirmed with any portion of the foregoing releases and indemnities, the Debtors and NT reserve the right to amend the Plan so as to give effect as much as possible to them or to delete them.

(c)     The foregoing provisions are an integral part of the Plan and are essential to its implementation.  If and to the extent that the Bankruptcy Court concludes that the Plan cannot be confirmed with any portion of the foregoing releases and indemnities, the Debtors reserve the right to amend the Plan so as to give effect as much as possible to them or to delete them.

2.     <u>Injunction.</u>

(a)  Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that all Entities who have held, hold or may hold Claims against or Interests in a Debtor, with respect to any such Claims or Interests, are permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Liquidating Trusts, the Trust Oversight Committees and the Liquidating Trustees, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the Debtors, or any property of any such transferee or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, of any judgment, award, decree or order against the Debtors, the Liquidating Trusts, the Trust Oversight Committees and the Liquidating Trustees, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the Debtors, the Liquidating Trusts, the Trust Oversight Committees  and the Liquidating Trustees or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Liquidating Trusts, the Trust Oversight Committees and the Liquidating Trustees, any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Entities; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to the Debtors, the Liquidating Trusts, the Trust Oversight Committees and the Liquidating Trustees, any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any Debtors; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(b)  Furthermore, except as otherwise expressly provided in the Plan, for the consideration described in the Plan, as of the Effective Date, all Entities who have held, hold or may hold claims released pursuant to Article XII of the Plan, whether known or unknown, and their respective agents, attorneys and all others acting for or on their behalf, shall be permanently

enjoined on and after the Effective Date, with respect to any claim released pursuant to Article XII of the Plan, from (i) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any claim against any Indemnified Person or the property of any of them; (ii) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against any Indemnified Person or the property of any Indemnified Person; (iii) creating, perfecting or enforcing any encumbrance of any kind against any Indemnified Person; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due to any Indemnified Person; and (v) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan.  In the event that any Entity takes any action that is prohibited by, or is otherwise inconsistent with the provisions of Article XII of the Plan, then, upon notice to the Bankruptcy Court, the action or proceeding in which the claim of such Entity is asserted shall automatically be transferred to the Bankruptcy Court for enforcement of the provisions Article XII of the Plan

(c)   Revocation.

Notwithstanding any of the foregoing, a Liquidating Trustee may, on motion, seek an order of the Bankruptcy Court vacating one or more of the releases granted in the Plan to an Indemnified Person in the event such Indemnified Person should breach the terms of an Employment Agreement.

## Q.   CONFLICTS; JURISDICTION

1.   Conflicts between Plan and Confirmation Order.

In the event the terms of the Plan and the Confirmation Order conflict, the terms of the Confirmation Order shall govern.

2.   Term of Injunction or Stays.

Unless otherwise provided, any injunction or stay imposed by operation of §§ 105 or 362 shall remain in full force and effect until the Effective Date rather than the Confirmation Date. Nothing in this such provision of the Plan, however, shall be construed as a limitation of the permanent injunctions provided for in Article XII of the Plan.

3.   Retention of Jurisdiction.

Notwithstanding entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

(a)   to determine (i) any Disputed Claims, Disputed Interests and all related Claims accruing after the Confirmation Date including rights and liabilities under contracts giving rise to such Claims, (ii) the validity, extent, priority and non-avoidability of consensual and nonconsensual Liens and other encumbrances, (iii) pre-confirmation tax liability pursuant to § 505, and (iv) controversies and disputes regarding the interpretation of the Plan and documents executed in connection therewith;

(b)     to allow, disallow, estimate, liquidate or determine any Claim or Interest against a Debtor and to enter or enforce any order requiring the Filing of any such Claim or Interest before a particular date;

(c)     to approve all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease of a Debtor pursuant to § 365 and Article IX hereof;

(d)     to determine any request for payment of an Administrative Expense entitled to priority under § 507(a)(1), including compensation of parties entitled thereto;

(e)     to resolve controversies and disputes regarding the interpretation and implementation of the Plan and the Liquidating Trust Agreement, any disputes relating to whether or not a timely and proper proof of Claim was Filed or whether a Disallowed Claim or Disallowed Interest should be reinstated;

(f)     to implement the provisions of the Plan and the Liquidating Trust Agreement and entry of orders in aid of confirmation and consummation of the Plan, including any disputes concerning the enforceability or applicability of the releases and injunctions contained herein;

(g)     to determine issues relating to the garnishment of any distributions payable under the terms of the Plan;

(h)     to modify the Plan pursuant to § 1127;

(i)     to adjudicate any and all Causes of Action that arose in the Case prior to the Confirmation Date or in connection with the implementation of the Plan, whether or not pending on the Confirmation Date, including without limitation, any remands of appeals;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims, Disputed Interests or the administration thereof;

(k)     to resolve any disputes concerning whether a person or entity had sufficient notice of the Case, the applicable Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(l)     to determine any and all applications, Claims, Interests, pending adversary proceedings and contested matters (including, without limitation, any adversary proceeding or other proceeding to recharacterize agreements or reclassify Claims or Interests) in these Cases;

(m)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(n)     to seek the issuance of such orders in aid of execution of the Plan, to the extent authorized by § 1142;

(o)     to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(p)     to recover all assets of a Debtor and property of any Estate, wherever located, including any Cause of Action under §§ 544 through 551;

(q)     to resolve any dispute relating to the approval and payment of the fees and expenses of a Liquidating Trustee, or its respective professionals;

(r)     to resolve matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146;

(s)     to hear any other matter not inconsistent with the Bankruptcy Code;

(t)     to resolve any and all disputes or controversies relating to distributions to be made, and/or reserves  or escrows to be established, under the Plan;

(u)     to enter one or more final decrees closing the Case;

(v)     to enforce the injunction granted under Article XII of the Plan;

(w)     to issue any orders required in aid of enforcing this Order in the Country of Norway, or as requested by a Norwegian judicial, quasi-judicial, administrative tribunal or court; and

(x)     to approve settlements or other disposition relating to all of the above.

4.     <u>Successors and Assigns.</u>

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

5.     <u>CramDown</u>

The Plan Proponents shall request the Bankruptcy Court to confirm the Plan pursuant to § 1129(b), notwithstanding the requirements of § 1129(a)(8), on the basis that the Plan is fair and equitable as to that Creditors and does not discriminate unfairly with respect to any non-consenting Impaired Class of Claims.  The Plan Proponents reserve the right to alter the treatment of any Class in order to effectuate a cram down under § 1129(b).

6.     <u>Modification of the Plan.</u>

The Plan Proponents reserve the right, in accordance with the Bankruptcy Code, to amend or modify this Plan prior to the Confirmation Date.  After the Confirmation Date, but before the Effective Date, the Plan Proponents may, upon order of the Court, amend or modify this Plan in accordance with § 1127(b), or remedy any defect or omission or reconcile any

41

inconsistency in this Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.  After the Effective Date, the Liquidating Trustees may, upon order of the Court, amend or modify the Plan in accordance with § 1127(b), or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.

       7.      <u>Withdrawal or Revocation of the Plan.</u>

The Plan Proponents reserve the right to revoke or withdraw the Plan, prior to the Confirmation Date.  In the event one or more of the Debtors abandon confirmation or withdraw the Plan, then NT may continue to prosecute the Plan as sole Plan Proponent of the Plan.  If the Confirmation Date does not occur, the Plan shall be of no further force or effect.

       8.      <u>Notices.</u>

All notices, requests, elections, or demands in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and sent to the following:

| Counsel for the Debtors: | John P. Melko |
| --- | --- |
| | GARDERE WYNNE SEWELL LLP |
| | 1000 Louisiana |
| | Suite 3400 |
| | Houston, Texas 77002 |
| | Telephone: (713) 276-5727 |
| | Facsimile: (713) 276-6727 |
| | |
| Counsel for NT: | Rhett G. Campbell |
| | THOMPSON & KNIGHT LLP |
| | 333 Clay Street, Ste. 3300 |
| | Houston, TX  77002-4499 |
| | Telephone:  (713) 654.8111 |
| | Facsimile:  (713) 654.1871 |
| | |
| | and |
| | |
| | Ira L. Herman |
| | THOMPSON & KNIGHT LLP |
| | 919 Third Avenue, 39th Floor |
| | New York, NY  10022 |
| | Telephone:  (212) 751.3001 |
| | Facsimile:  (212) 751.3113 |

42

9.      Implementation of Plan.

The parties shall use reasonable efforts and shall cooperate with one another to effect the transactions contemplated by the Plan.  Each of the parties hereto shall execute such documents and other papers and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby.

10.      Governing Law.

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas without reference to its conflict of laws rules.

11.      Severability.

Should any term or provision of the Plan be determined by the Bankruptcy Court to be invalid, void or unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any other provision of the Plan.  If any term or provision of the Plan is of such a character as to deny Confirmation, the Plan Proponents reserve the right to strike such provisions from the Plan and seek Confirmation of the Plan as modified. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.      All Claims.

The Plan is intended to address and provide for the satisfaction of all Claims against the Debtors of whatever character whether or not disputed, contingent, or liquidated and whether or not allowed by the Bankruptcy Court under § 502.  However, only those Claims Allowed under § 502 shall be entitled to receive the treatment afforded by the Plan.

13.      Exculpation

Neither the Plan Proponents nor their present or former officers, employees, agents, advisers, affiliates, underwriters or investment bankers, nor any other professional persons employed by any of them (collectively, the "Exculpated Persons"), shall have or incur any liability to any Entity for any act taken or omission made in good faith in connection with or related to formulating, negotiating, implementing, confirming or consummating the Plan, the Disclosure Statement or any Plan Document.  The Exculpated Persons shall have no liability to the Debtors, any Creditor, Interest holder, any other party in interest in the Cases or any other Entity for actions taken or not taken under the Plan or the Liquidating Trust Agreement, in connection herewith or with respect thereto, or arising out of their administration of the Plan or the property to be distributed under the Plan, in good faith, including, without limitation, failure to obtain Confirmation or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such

43

Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

14.      Binding Effect.

The Plan shall be binding upon and inure to the benefit of the Debtors, the Liquidating Trusts, the Liquidating Trustees, all present and future holders of Claims and Interests, and their respective successors and assigns, and all other parties in interest in these Cases.

15.      Section 1146(c) Exemption

Pursuant to § 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer or the holding of title for administrative purposes by the Debtors or transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated by the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.

**R.      CONDITIONS TO THE EFFECTIVENESS OF THE PLAN**

1.      Conditions

The occurrence of the Effective Date of the Plan is subject to satisfaction of the following conditions precedent:

a.      Entry of Confirmation Order.  The Clerk of the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Plan Proponents, authorizing and directing that the Debtors and the Liquidating Trustees take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases and other agreements or documents credited in connection with the Plan, there shall not be a stay or injunction in effect with respect thereto and the Confirmation Order shall have become a Final Order.

b.      Implementing Documents.  All documents necessary for the implementation of the Plan shall be in form and substance satisfactory to the Debtors and shall have been executed by all applicable parties thereto.

c.      Regulatory Approvals.  All authorizations, consents, and regulatory approvals required (if any) in connection with the effectiveness of the Plan shall have been obtained.

d.      Waiver of Conditions Precedent.  Each of the conditions in the Plan may be waived, in whole or in part, at the discretion of the Debtors.

2.      Failure to Satisfy Conditions

If each condition to the Effective Date has not been satisfied or duly waived within sixty (60) days after the Confirmation Date, then (unless the period for satisfaction or waiver of conditions has been extended at the option of the Debtors for a period not exceeding 60 days)

44

upon motion by any party in interest, made before the time that each of the conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; *provided, however,* that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Clerk of the Bankruptcy Court enters a Final Order granting such motion.  If the Confirmation Order is vacated pursuant to the Plan, the Plan shall be deemed null and void in all respects, including without limitation the discharge of Claims pursuant to Section 1141 of the Bankruptcy Code and the assumptions or rejections of executory contracts and unexpired leases provided for herein, and nothing contained herein shall (1) constitute a waiver or release of any claims by, or Claims against, the Debtors or (2) prejudice in any manner the rights of the Debtors.

**S.      EFFECTS OF CONFIRMATION AND MISCELLANEOUS**

1.      <u>Binding Effect</u>

Except as otherwise provided in § 1141(d)(3), on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

2.      <u>Discharge and Injunction</u>

Except as otherwise expressly provided in the Plan or Confirmation Order, confirmation of the Plan shall operate  pursuant to § 1141(d)(1) as a discharge, effective as of the close of the Effective Date, of any and all debts and liabilities of, and any Claims or Liens against and Interests in, the Debtors or any of their assets that existed or arose at any time before Confirmation.

3.      <u>No Liability for Solicitation or Participation</u>

Pursuant to § 1125, Entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable on account of such solicitation or participation, for violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

4.      <u>Injunctions or Stays</u>

Unless otherwise provided, all injunctions or stays arising under or entered during the Cases under §§ 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

5.      <u>Procedures for Resolving and Treating Contested Claims</u>

As soon as practicable, but in no event later than ninety (90) days following the Effective Date, the Liquidating Trustees shall file objections to claims with the Court and serve a copy on

the holder of the applicable Claims to which the objections are made. There shall be no post-confirmation right to object to the extent a particular Claim is specifically Allowed under the Plan or under a prior Final Order. The Liquidating Trustees' right to object to Claims, if any, filed or amended after the Effective Date, shall not be limited by the Plan. Any Claims filed after the applicable bar date shall be Disallowed unless the Court determines in a Final Order that there was excusable neglect for filing such Claims after the applicable bar date.

The Liquidating Trustees may litigate to judgment, settle or withdraw objections to Disputed Claims.

6.      Indemnification Obligations

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Petition Date to indemnify, defend, reimburse, or limit the liability of their directors, officers, or employees against any claims or causes of action as provided in the Debtors' bylaws, or applicable state or federal law, will survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before or after the Petition Date and shall be assumed by the Liquidating Trusts.  The Trusts' indemnification obligations are limited to those authorized or permitted under state or federal law as the same is now or may become applicable at the time any claim for indemnification is made.

7.      Successors and Assigns

The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity.

8.      Plan Documents

Forms of certain significant documents necessary or appropriate to implement the terms of the Plan may be filed with the Court prior to the Confirmation Date.

## T.      CERTAIN FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

## U.      CERTAIN BANKRUPTCY CONSIDERATIONS

Although the Debtors and NT believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, modifications of the Plan may be required for Confirmation or that such modifications may necessitate the re-solicitation of votes.  In addition,

although the Plan Proponents believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

The Plan provides for no distributions to holders of Intercompany Claims and Equity Interests. The Bankruptcy Code conclusively deems those Classes to have rejected the Plan. Notwithstanding such deemed rejection of the Plan, the Bankruptcy Court may confirm the Plan if at least one impaired class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). Thus, for the Plan to be confirmed, one impaired Class must vote to accept the Plan. As to each impaired class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these classes. The Plan Proponents believe that the Plan satisfies these requirements.

## V.      RISKS RELATING TO PLAN

     1.      <u>Market</u>

     <u>Further Market Decline</u>. The Liquidating Trusts have been formed to sell the assets of the Debtors on an arm's length basis pursuant to the terms of the Liquidating Trust Agreement. The assets will not be used in operations. Accordingly, the major risk to Creditors is a further erosion of the value of the assets to be sold due to worsening market conditions. The Plan Proponents believe that market conditions will improve to enable the Liquidating Trusts to recover more than would be recovered today on a forced sale basis.

     2.      <u>Litigation Risks</u>

The Plan Proponents are unable to predict the outcome of all of its pending litigation matters, and there can be no assurance that the ultimate resolution of such matters will not have a materially adverse effect on the financial condition of the Liquidating Trusts.

## X.  <u>CONFIRMATION OF THE PLAN</u>

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

## A.      Classification

The Plan Proponents are required under Section 1122 of the Bankruptcy Code to classify the Claims and Interests of Creditors and Interest Holders into Classes that contain Claims and Interests substantially similar to the other Claims or Interests in such Class. The Plan can be confirmed so long as there is one consenting Class of Impaired Claims or Interests (not including the votes of insiders), and so long as the other requirements of Section 1129 of the Bankruptcy Code for Confirmation are met.

## B.      Disclosure and Solicitation

This Disclosure Statement is delivered to the holders of Claims in Impaired Classes that receive or retain property pursuant to the Plan, in accordance with §§ 1125 and 1126. Bankruptcy Code Section 1125 requires that full disclosure be made to all holders of Claims and

Interests in Impaired Classes that are to receive or retain property pursuant to a plan as a condition to the solicitation of acceptances and rejection of any such plan.

## C.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  By order of the Bankruptcy Court, the Confirmation Hearing has been scheduled for [_____, **2009, at** _____].m., Central Time, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Avenue, 4th Floor, Houston, Texas 77002.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any parties in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, set forth the name of the objector, the nature and amount of Claim or Interest held or asserted by the objector against the Debtors' Estates or property, the basis for the objection and the specific grounds therefor, and be filed with the Bankruptcy Court no later than the Objection Deadline, with a copy to chambers, together with proof of service thereof, and served upon (a) Gardere Wynne Sewell, L.L.P., Attorneys for the Debtor, 1000 Louisiana, Suite 3400, Houston, Texas 77002, Attention: John P. Melko; (b) Thompson & Knight LLP, Attorneys for the Bond Trustee, 333 Clay Street, Suite 3300, Houston, Texas  77002-4499, Attention: Rhett G. Campbell; and (c) The United States Trustee for the Southern District of Texas, Houston Division, 515 Rusk Avenue, Room 3516, Houston, Texas 77002, Attention: Ellen Maresh Hickman.

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014.  **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## D.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of § 1129 are met.  Among the requirements for confirmation are that the Plan (a) is accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (b) is feasible, and (c) is in the "best interests" of holders of Claims and Equity Interests impaired under the Plan.

### 1.    Fair and Equitable Test

The Plan Proponents may seek to confirm the Plan notwithstanding the nonacceptance of the Plan by any impaired Class of Claims or Interests entitled to vote on the Plan.  To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each dissenting impaired Class. The Plan Proponents believe that Claims in Classes 3, 4 and 5 and Interests in Class 6 are impaired under the Plan.  A plan does not discriminate unfairly if the legal rights of a dissenting impaired class are treated in a manner consistent with the treatment of other classes whose legal

48

rights are substantially similar to those of the dissenting impaired class and if no class receives more than it is entitled to for its claims or equity interests.  The Plan Proponents believe the Plan satisfies this requirement.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

A.    Secured Claims

Either (i) each holder of an impaired Secured Claim (x) retains the Liens securing such Claim to the extent of the Allowed amount of such Claim and (y) receives on account of such Claim deferred Cash payments totaling at least the Allowed amount of such Claim with a present value as of the effective date at least equal to the value of such holder's interest in the estate's interest in the property securing its Liens; (ii) property subject to the Lien of the impaired creditor is sold free and clear of that Lien, with the Lien attaching to the proceeds of the sale, and the Lien proceeds treated in accordance with clauses (i) or (iii) hereof, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its Claim under the Plan.

B.    Unsecured Claims

Either (i) each holder of an impaired Unsecured Claim receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (ii) the holders of Claims and Equity Interests that are junior to the Claims of the dissenting Class will not receive or retain any property under the Plan on account of such junior Claims or Equity Interests.

C.    Interests

Under the Plan, either (i) each Interest holder will receive or retain property of a value equal to the greater of (x) the fixed liquidation preference or redemption price, if any, of such Equity Interest or (y) the value of the Equity Interest, or (ii) the holders of Equity Interests that are junior to the dissenting class of equity interests will not receive or retain any property under the Plan on account of such junior interest.

The Plan Proponents believe the Plan may be confirmed on a nonconsensual basis if the holders of any Class of Claims or Interests entitled to vote on the Plan vote to reject the Plan (provided at least one impaired Class of Claims votes to accept the Plan).  If appropriate, the Debtors will demonstrate at the Confirmation Hearing that the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code as to any non-accepting Class.

2.    <u>Feasibility</u>

The Bankruptcy Code requires that confirmation of a Chapter 11 plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  Because the Plan provides for distributions of cash on hand and to the extent recovered in litigation, there are no contingencies that affect feasibility of the Plan.

49

3.      "Best Interests" Test

With respect to each impaired Class of Claims and Interests, confirmation of the Plan requires each such holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

This analysis requires the Bankruptcy Court to determine what the holders of Allowed Claims and Allowed Interests in each impaired Class would receive from the liquidation of the Debtors' assets and properties in the context of a Chapter 7 liquidation case. The Cash amount which would be available for the satisfaction of Claims and Interests of the Debtors would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from the use of Chapter 7 for the purposes of liquidation.

The costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisers, accountants that are allowed in the Chapter 7 case. In addition, claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtors during the pendency of the Chapter 11 Cases. All of these types of Claims (and such other claims which may arise in the liquidation case or result from the pending Chapter 11 Cases) would be required to be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of the liquidation of the Debtors' assets and properties (after subtracting the amounts attributable to the types of claims described above) is then compared with the present value offered to such classes of Claims and Interests under the Plan.

After consideration of the effects a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including: (a) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisers to the trustee and (b) the potential erosion in value of assets in a Chapter 7 case in the context of the liquidation required under Chapter 7, the Debtors believe that confirmation of the Plan will provide each holder of an Allowed Claim or Allowed Interest with not less than the amount it would receive pursuant to liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is attached hereto as Exhibit B. It provides a summary of the liquidation values of the Debtors' assets assuming a Chapter 7 liquidation in which a trustee would be appointed by the Bankruptcy Court to liquidate the Assets. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and management. The Liquidation Analysis is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected may not be realized if the Debtors were to be liquidated under Chapter 7. The Chapter 7 liquidation period is assumed to be a period of time sufficient in length to allow for the collection of receivables and the winding down of operations.

## XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION

The Debtors have evaluated alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by parties in interest, assuming confirmation of the Plan. The following discussion provides a summary of the Debtors' analysis leading to its conclusion that a liquidation or alternative plan of reorganization would not provide the highest value to parties in interest.

### A.    Liquidation Under Chapter 7

In Chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to Creditors in accordance with priorities established by the Bankruptcy Code.

Under the liquidation analysis, the projected payout to Class 4.1A, 4.1B, 4.1C, 4.1D, 4.1E, 4.2A, 4.2B, 4.2C, 4.2D and 4.2E Creditors would receive less in respect of their secured claims in a Chapter 7 case than the percentage they anticipate receiving under the Plan. Also, Creditors in Classes 5A, 5B, 5C, 5D, and 5E would not receive any distribution under a Chapter 7 liquidation scenario on account of their unsecured claims. The Debtors and NT believe that a Chapter 7 trustee would be charged with a duty to expeditiously liquidate the assets of the Estates, including the Rigs. The Debtors and NT believe that the market is not conducive to a sale of the Rigs at this time and will not improve in the near term. Accordingly, a significantly higher return to creditors could be realized through a "cold stack" and subsequent sale by the Liquidating Trustees, as contemplated by the Plan. This regime will also reduce the incurrence of ongoing expenses. As discussed above, under the "best interests" of creditors, the Debtors and NT believe that liquidation under Chapter 7 would result in higher expenses and smaller distributions being made to creditors than those provided for in the Plan.

### B.    Alternative Plan(s) of Reorganization

If the Plan is not confirmed, the Debtors, the Bond Trustee, or any other party in interest could attempt to confirm a different plan. The Plan Proponents believe the Plan, as described herein, enables holders of Claims and Interests to have the greatest chance to realize an enhanced recovery.

51

## XII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF PLAN OF REORGANIZATION

### A.      Introduction

The following discussion summarizes certain significant U.S. federal income tax consequences of the transactions that are described herein and in the Plan that affect holders of Claims or Interests and the Debtors.  This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Department regulations promulgated thereunder (the "Treasury Regulations"), judicial authority and current administrative rulings and practice now in effect.  These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect holders of Claims or Interests and the Debtors.  The federal income tax consequences to any particular holder of a Claim or Interests may be affected by matters not discussed below.  For example, neither the impact of the Plan on foreign holders of Claims or Interests nor the impact under any state or local law is discussed herein.  Further, this summary generally does not address the tax consequences to Claim holders who may have acquired their Claims from the initial holders nor does it address the tax considerations applicable to Claim holders or Interest holders that may be subject to special tax rules such as financial institutions, insurance companies, dealers in securities or currencies, tax-exempt organizations or taxpayers subject to the alternative minimum tax.   To the extent that the summary of payments to Claimholders in this section conflicts with other parts of this Disclosure Statement or the Plan, the discussion in such other parts of the Disclosure Statement or the Plan shall govern.

NO RULING WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (the "IRS"), AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE SOUGHT, WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.  THE DISCUSSION SET FORTH BELOW IS FOR GENERAL INFORMATION ONLY.  THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.  EACH CLAIM AND INTEREST HOLDER IS URGED TO CONSULT WITH ITS OWN TAX ADVISER REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

### B.      Consequences to Holders of Claims

#### 1.      Realization and Recognition of Gain or Loss in General

The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when the holder's Claim becomes an Allowed Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim and whether the holder's Claim constitutes a "security" for federal income tax purposes.

Generally, a holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for stock and other property (such as Cash and new debt

instruments), in an amount equal to the difference between (i) the sum of the amount of any Cash, the issue price of any debt instrument, and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  The treatment of accrued but unpaid interest and amounts allocable thereto varies depending on the nature of the holder's claim and is discussed below.

Whether or not such realized gain or loss will be recognized (i.e., taken into account) for federal income tax purposes will depend in part upon whether such exchange qualifies as a recapitalization or other "reorganization" as defined in the Tax Code, which may in turn depend upon whether the Claim exchanged is classified as a "security" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations.  One of the most significant factors considered in determining whether a particular debt instrument is a security is the original term thereof.  In general, the longer the term of an instrument, the greater the likelihood that it will be considered a security.  As a general rule, a debt instrument having an original term of 10 years or more will be classified as a security, and a debt instrument having an original term of fewer than five years will not.  Debt instruments having a term of at least five years but less than 10 years are likely to be treated as securities, but may not be, depending upon their resemblance to ordinary promissory notes, whether they are publicly traded, whether the instruments are secured, the financial condition of the debtor at the time the debt instruments are issued and other factors.  Each holder of an Allowed Claim should consult his or her own tax advisor to determine whether his or her Allowed Claim constitutes a security for federal income tax purposes.

2.    Holders of Allowed Administrative Expenses

Holders of allowed Administrative Expenses will be paid in full on or promptly after the Effective Date or the date of allowance.  Holders of Administrative Expenses should recognize ordinary income upon receipt of payment to the extent that the Expense arose in connection with the performance of services and such amount had not previously been included in income.  To the extent that the Expense did not arise in connection with the performance of services, the holder should recognize gain or loss in an amount equal to the difference between the amount received and his or her tax basis in the Claim.  The gain or loss should be capital gain or loss under Section 1221 of the Tax Code to the extent that the Expense did not arise in the ordinary course of a trade or business or from the sale of inventory, in which case such gain or loss should generally be treated as ordinary.  Any capital gain or loss recognized by a holder of a Expense should be long-term capital gain or loss with respect to a Expense held for more than one year.

3.    Holders of Secured Claims (Classes 2, 3 and 4)

Holders of Secured Claims shall receive the indubitable equivalent of the collateral as determined by the Bankruptcy Court in cash with any deficiency amount being treated as a Class 5 Claim.  Secured Claimholders (other than those that are exempt from U.S. federal income tax) should recognize gain or loss upon consummation of the Plan in an amount equal to the difference between the amount of cash and their tax basis in the Claim, plus interest income for

53

any interest paid.  A Claimholder's tax basis in a Claim should generally equal the amount advanced to the Debtors or amount included in income as a result of the provision of goods or services to the Debtors, except to the extent that a bad debt loss had been previously claimed. The gain or loss should be capital gain or loss under Section 1221 of the Tax Code to the extent that the Claim did not arise in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtor, in which case such gain or loss should generally be ordinary.  Any capital gain or loss recognized by a Claimholder should be long-term capital gain or loss with respect to Claims held for more than one year.

       4.        <u>Holders of Allowed General Unsecured Claims (Class 5)</u>

Holders of Class 5 Claims will receive a nominal or no distribution under the Plan.  A Claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the Debtors, except to the extent that a bad debt loss had previously been claimed.  The gain or loss should be capital gain or loss under Section 1221 of the Tax Code to the extent that the Unsecured Claim did not arise in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtor, in which case such gain or loss should generally be ordinary.  Any capital gain or loss recognized by a holder of a Claim should be long-term capital gain or loss with respect to Claims held for more than one year.

       5.        <u>Holders of Intercompany Claims (Class 6)</u>

Class 6 Claims will be Disallowed.  The Debtors will incur no adverse tax consequences as the result of elimination of intercompany debt.

       6.        <u>Equity Interests (Class 7)</u>

Holders of Class 7 Interests will receive no distribution under the Plan and should recognize a capital loss to the extent of such holder's tax basis in the Interests held.  Such capital loss should be long-term capital loss if the Interest was held by the holder for more than one year.

       7.        <u>Withholding and Reporting</u>

The Debtors will withhold all amounts required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code.  Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding" at a rate equal to the fourth lowest rate of tax under Section 1(c) of the Tax Code.  Backup withholding generally applies if the Holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and the Holder is not subject to backup withholding.  Your ballot contains a place to indicate your TIN.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX

PROFESSIONAL.  THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISER REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT ENTITY.

**C.      Consequences of Discharge**

        1.      <u>Discharge of Indebtedness Income Generally</u>

Generally, a taxpayer recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price.  The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the issue price of any new indebtedness issued by the taxpayer, the amount of cash and the fair market value of any other consideration (including stock of the taxpayer) given in exchange for the indebtedness satisfied.

However, COD income is not included in gross income to a debtor if the discharge occurs in a Title 11 case or the discharge occurs when the debtor is insolvent (except with respect to certain discharged intercompany debt which is treated as both income and an offsetting loss to the group).  Rather the debtor generally must, after determining its tax for the taxable year of discharge, reduce its net operating losses ("NOL(s)") and any capital loss carryovers first and then, as of the first day of the next taxable year, reduce the tax basis of its assets by the amount of COD income excluded from gross income by this exception.

The COD income recognized by the Debtors as a result of consummation of the Plan will not be includable in the income to the Debtors realizing such income but will generally first reduce the NOL carryover of the Debtors after the calculation of tax for the taxable year of discharge, then would reduce the tax basis of the assets held by a Debtor on the first day of the taxable year after discharge.   Because the Debtors are liquidating, availability of NOL's to offset future income is not relevant.

**D.      Consequences To The Liquidating Trusts and Beneficiaries**

For federal income tax purposes, the Liquidating Trusts shall be considered grantor trusts of which the Debtors are the grantors, and shall not have any separate liability for federal income taxes relating to or arising from the transfer, sale or other administration of the property of the Liquidating Trusts.  Beneficiaries of the Liquidating Trusts will, therefore, have the same treatment of their claims discussed in section C above.

## XIII.  <u>CONCLUSION AND RECOMMENDATION</u>

The Plan Proponents believe that the Plan is in the best interests of all Creditors and holders of Interests and urge the holders of all Claims and Interests who receive ballots to vote to accept the Plan and to evidence such acceptance by sending their Ballots to the Balloting Agent, so as to be actually received on or before 5:00 p.m., Central Time, on [_____, 2009.]

Dated: Houston, Texas
        October 2, 2009

Respectfully submitted,

| By: _____ /s/ _____ John P. Melko _____ | By: _____ /s/ _____ Rhett G. Campbell _____ |
|---|---|
| John P. Melko<br>Texas State Bar No. 13919600<br>jmelko@gardere.com<br>713-276-5727 (*direct dial*)<br>713-276-6727 (*direct fax*)<br>Attorney in Charge | Rhett G. Campbell<br>Texas State Bar No. 03714500<br>rcampbell@tklaw.com<br>713-653-8660 (*direct dial*)<br>723-654-1871 (*direct fax*)<br>Attorney in Charge |
| OF COUNSEL:<br>Amy Catherine Dinn<br>Robert S. Blanc<br>Clinton R. Snow<br>GARDERE WYNNE SEWELL LLP<br>1000 Louisiana, Suite 3400<br>Houston, Texas 77002-5011<br>Telephone: 713-276-5500<br>Facsimile: 713-276-5555 | OF COUNSEL:<br>Demetra L. Liggins (TX 24026844)<br>Ira L. Herman (TX 24063314)<br>THOMPSON & KNIGHT LLP<br>333 Clay Street, Suite 3300<br>Houston, TX 77002-4499<br>Telephone: (713) 654-8111<br>Facsimile: (713) 654-1871 |
| COUNSEL FOR DEBTORS VIKING OFFSHORE (USA) INC., VIKING PRODUCER INC., VIKING PROSPECTOR INC., VIKING CENTURY INC. and VIKING DRILLING ASA | COUNSEL FOR NORSK TILLITSMANN ASA, BOND TRUSTEE UNDER THE FIRST LIEN LOAN AGREEMENT AND SECOND LIEN LOAN AGREEMENT |

## CERTIFICATE OF SERVICE

    This is to certify that pursuant to Bankruptcy Rule 3017(a) a true and correct copy of the foregoing document was forwarded by electronic transmission via the Court's ECF system to the United States trustee and counsel for the Bondholders. The foregoing document was also served by electronic transmission via the Court's ECF system to all parties entitled to receive notice in these cases.

_____ /s/ _____ John P. Melko _____
John P. Melko

HOUSTON 1049970v.8